1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| BRANDON DRAKE and ERIC SAAVEDRA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>VALVE CORPORATION,<br><br>Defendant. | Case No. 2:24-cv-01743<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................... 2

II.    PARTIES ...................................................................................................... 5

III.   JURISDICTION AND VENUE ..................................................................... 6

IV.    FACTUAL BACKGROUND .......................................................................... 7

       A.  The PC Gaming Industry ...................................................................... 7

       B.  Valve Becomes a Dominant Fixture in the PC Gaming Industry ..................... 8

V.     VALVE HAS ANTICOMPETITIVELY RESTRAINED TRADE AND
       MONOPOLIZED THE PC GAME DISTRIBUTION MARKET ................. 12

       A.  Valve Requires that Publishers Accept an Anticompetitive PMFN Clause ........ 14

       B.  Valve Has Continuously Enforced its PMFN ............................................ 19

       C.  Valve Has Anticompetitively Restrained Trade by Linking Its In-Game Payment
           Processing to PC Game Distribution ..................................................... 23

VI.    THE ANTICOMPETITIVE EFFECTS OF VALVE'S CONDUCT ............................ 24

       A.  Valve's Excessive and Anticompetitive Commission Rate is Unconnected to Its
           Costs or Any Purported Benefits of the Steam Store ................................ 27

       B.  Valve's Anticompetitive Actions Prevent Other Stores from Offering More
           Competitive Commission Rates ........................................................... 34

       C.  In a Competitive Market, Valve's Commission Rate Would Decrease ............... 36

VII.   RELEVANT MARKETS ............................................................................. 37

       A.  Relevant Product Markets .................................................................. 37

           1.  PC Game Distribution is a Relevant Product Market .......................... 37

           2.  PC In-Game Payment Processing is a Relevant Product Market ............ 42

       B.  The United States is the Relevant Geographic Market .............................. 44

VIII.  VALVE POSSESSES MONOPOLY AND/OR MARKET POWER IN THE
       RELEVANT MARKETS ............................................................................. 45

       A.  Valve's Steam Store Dominates PC Game Distribution and In-Game Payment
           Processing ..................................................................................... 45

       B.  Significant Barriers to Entry Exist ...................................................... 47

       C.  Major Technology Firms Have Struggled to Compete with Valve ................... 50

       D.  Valve's Supracompetitive Commission is Direct Evidence of its Monopoly
           Power and Market Dominance .......................................................... 56

IX.    ANTITRUST IMPACT ................................................................................ 57

X.     CLASS ACTION ALLEGATIONS .............................................................. 58

XI.    FRAUDULENT CONCEALMENT ............................................................. 60

i

CLASS ACTION COMPLAINT                    Cotchett, Pitre & McCarthy, LLP
Case No. 2:24-cv-01743                     999 N. Northlake Way, Suite 215
                                           Seattle, WA 98103

XII.    CAUSES OF ACTION ................................................................................................ 61

    FIRST CAUSE OF ACTION: SHERMAN ACT SECTION 2—
    MONOPOLIZATION OF THE PC GAME DISTRIBUTION MARKET ................... 61

    SECOND CAUSE OF ACTION: SHERMAN ACT SECTION 2—ATTEMPTED
    MONOPOLIZATION OF THE PC GAME DISTRIBUTION MARKET ................... 61

    THIRD CAUSE OF ACTION: SHERMAN ACT SECTION 2—
    MONOPOLIZATION OF THE PC IN-GAME PAYMENT PROCESSING
    MARKET ................................................................................................................ 62

    FOURTH CAUSE OF ACTION: SHERMAN ACT SECTION 2—ATTEMPTED
    MONOPOLIZATION OF THE PC IN-GAME PAYMENT PROCESSING
    MARKET ................................................................................................................ 62

    FIFTH CAUSE OF ACTION: SHERMAN ACT SECTION 1— UNREASONABLE
    RESTRAINTS OF TRADE THROUGH TYING ........................................................ 63

    SIXTH CAUSE OF ACTION: SHERMAN ACT SECTION 1—UNREASONABLE
    RESTRAINTS OF TRADE .................................................................................... 64

    SEVENTH CAUSE OF ACTION— CALIFORNIA UNFAIR COMPETITION
    LAW (California Subclass) .................................................................................... 65

    EIGHTH CAUSE OF ACTION—WASHINGTON CONSUMER PROTECTION
    ACT (Nationwide Class) ........................................................................................ 66

XIII.    PRAYER FOR RELIEF ......................................................................................... 66

XIV.    JURY DEMAND ...................................................................................................... 67

Plaintiffs Brandon Drake and Eric Saavedra, individually and on behalf of all others similarly situated ("Plaintiffs"), bring this action against Valve Corporation ("Valve") under federal and state antitrust laws and state unfair competition laws, seeking public injunctive relief and damages, and allege as follows:

## I. INTRODUCTION

1.    Over the last decade, the personal computer ("PC") gaming industry has seen remarkable growth. For example, PC gaming industry revenue rose from ~$30 billion in 2015 to ~$40 billion in 2023.[1] This showcases the significant rise in popularity and economic influence of PC gaming.

2.    As the PC gaming industry has surged, Valve's market dominance has remained constant. In 2005, Valve introduced the Steam Store, an online platform for purchasing PC games from third-party game developers (also known as "publishers"), quickly establishing itself as the industry leader. Today, Valve continues to dominate, with the Steam Store handling about 75% of the billions of dollars in annual PC game sales, making it the largest game store both in the U.S. and worldwide.

3.    Because of Valve's dominant position, publishers are compelled to list their games on the Steam Store to reach a broad audience. This gives Valve significant leverage, allowing it to charge a 30% commission on most games sold on Steam, despite its limited role as an intermediary. Valve's commission, which is not linked to its costs, is much higher than what a PC game distribution platform would be able to charge in a competitive market. Consequently, publishers must increase their game prices to maintain their margins, resulting in higher costs for consumers.

---

[1] *Video Games Market Update*, Houlihan Lokey (Spring 2024), http://cdn.hl.com/pdf/2024/houlihan-lokey-video-games-market-update-spring-2024.pdf.

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

4. Valve has not secured or sustained its monopoly in game distribution, nor its ability to charge high prices, by operating a more efficient or effective game store than its competitors. Instead, Valve has leveraged its dominant position to suppress competition, enforcing anticompetitive measures to prevent affordable, high-quality, consumer-friendly alternatives from emerging.

5. Valve restricts competition through what is known as a Platform Most Favored Nation clause ("PMFN"), which it enforces on publishers wishing to sell their games on the Steam Store. This clause prevents publishers from offering their games at a lower price or with better features on any platform that competes with the Steam Store. As a result, competitors struggle to match Valve on both price and quality, reinforcing Valve's dominant market position and its associated network effects.

6. The predictable outcome of eliminating competition is that Valve has consistently reaped monopoly profits at the expense of consumers. The Steam Store, functioning as a middleman, requires few Valve employees to operate. Although Valve's 30% commission was initially based on the standard sales commission at brick-and-mortar game stores, the Steam Store, as an online marketplace, avoids most of the fixed costs that brick-and-mortar stores had to bear like rent, utilities, and logistics that justified that rate. Because of Steam's remarkably low employee headcount, Valve's commission generates billions of dollars annually in nearly pure profit.

7. Basic economics suggests that in a competitive market, high profits would attract new competitors, who would offer innovative and more affordable platforms, thereby reducing Valve's market share and eliminating excessive profits. However, Valve's PMFN clause, along with its ongoing anticompetitive measures to enforce and penalize attempts to bypass this clause, has made genuine competition impossible. Consequently, decades after its inception, Valve still

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

maintains its monopoly and profits without any significant competition. Consumers, on the other hand, suffer from higher prices, reduced output, and lower quality.

8.      Valve's dominance is not due to a lack of effort from competitors. Major tech companies and game developers like Epic Games, Electronic Arts ("EA"), Microsoft, and Discord have all tried to bypass the Steam Store's fees and create competitive platforms. These companies even attempted to reduce their commissions to more competitive levels. However, Valve's anticompetitive practices have prevented these platforms from competing on price or quality. Consequently, none of these competitors have managed to establish a strong market presence, and most have eventually folded under Valve's power.

9.      Valve has also extended its anticompetitive practices and monopoly power to the market for in-game payment processing. In 2012, Valve introduced the Steam Wallet, enabling users to upload funds and handle microtransactions for add-ons, perks, and gear within games they already own. The Steam Wallet integrates with the Steam Microtransactions API, making Valve the payment processor for these transactions. Similar to game sales, Valve takes a 30% cut of every microtransaction made with the Steam Wallet.

10.     There is no technological or efficiency-based justification for requiring microtransactions in Steam-purchased games to be processed exclusively by Steam. In many other industries and on competing platforms, consumers are allowed to choose their preferred in-game payment processing system.

11.     Valve permits publishers to sell in-game enhancements only if users pay through the Steam Wallet. Due to Valve's PMFN clause and its dominance in the PC Game Distribution Market (as defined below), publishers have little choice but to comply. This requirement doesn't serve any legitimate business purpose and constitutes an unlawful tying arrangement. It allows Valve to

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

leverage its monopoly power in the PC Game Distribution Market to impose a supracompetitive 30% fee in the In-Game Payment Processing Market (as defined below).

12.     With its dominant market share in PC Game Distribution, Valve has quickly become the only viable option for payment processing of in-game transactions. By leveraging its PMFN clause and through the use of anticompetitive tactics, Valve has extended its monopoly power to two markets. This results in a supracompetitive "tax" on the PC gaming industry, leading to higher prices and fewer, lower-quality games and payment processing options. Meanwhile, Valve's profits keep increasing, and consumers bear the cost.

13.     This lawsuit is filed by Plaintiffs representing themselves and a proposed class of consumers. They aim to address Valve's abuse of its market power, seeking to challenge Valve's efforts to restrain trade, monopolize, and maintain its monopoly in PC Game Distribution and In-Game Payment Processing. Valve's practices outlined herein violate Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2), the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200), and the Washington State Consumer Protection Act (RCW 19.86).

## II.    PARTIES

14.     Plaintiff Brandon Drake is a resident of Hampton, Virginia. Drake has been a Steam customer for at least nine years. During this time, Drake has purchased PC Games through the Steam Store and has also used Steam's in-game payment processing system to make in-game purchases. As a result of Valve's anticompetitive practices, Drake has paid supracompetitive commissions to Valve for each purchase of a PC Game and each in-game purchase through the Steam Store.

15.     Plaintiff Eric Saavedra is a resident of Hayward, California. Saavedra has been a Steam customer for at least ten years. During this time, Saavedra has purchased PC Games through the Steam Store and has also used Steam's in-game payment processing system to make in-game

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

purchases. As a result of Valve's anticompetitive practices, Saavedra has paid supracompetitive commissions to Valve for each purchase of a PC Game and each in-game purchase through the Steam Store.

16. Defendant Valve Corporation is the largest distributor of PC games in the world. Valve is incorporated in the State of Washington and maintains its headquarters at 10900 NE 4th Street, Suite 500, Bellevue, Washington 98004. It operates the Steam Store through which it distributes PC games online. As discussed herein, the Steam Store charges an anticompetitive fee of 30% for nearly every PC game and in-game transaction sold in the United States.

### III.    JURISDICTION AND VENUE

17. This action arises under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26, for alleged violations of Sections 1 and 2 of the Sherman Act. Plaintiffs also assert claims under Washington's Consumer Protection Act, RCW 19.86, as well as claims under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq.

18. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) as well as Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) & 26. The Court has supplemental jurisdiction for the claims under California state law and Washington state law pursuant to 28 U.S.C. § 1367.

19. This Court has personal jurisdiction over Valve because Valve maintains its headquarters in Washington.

20. Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 22 and 26, and pursuant to 28 U.S.C. § 1391(b), (c), and (d). Valve resides, transacts business, is found, and has agents in the Western District of Washington.

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

21.    Valve's acts at issue here were within the flow of, were intended to have, and did, in fact, have a substantial effect on the interstate commerce of the United States.

## IV.    FACTUAL BACKGROUND

### A.    The PC Gaming Industry

22.    Video games are interactive software that are played on electronic devices such as PCs, gaming consoles, smartphones, or tablets. In 2023, there were an estimated 3.2 billion people worldwide who engage in video gaming.

23.    Video games are generally categorized by the devices they are played on, such as PC games (for personal computers), console games (for systems like PlayStation or Xbox), and mobile games (for smartphones or tablets). Each game is designed to be compatible with its specific device type, meaning a PC game can only be played on PCs.

24.    PC games are video games that users download and install on their personal computers. These games can differ in size, scope, genre, and features, but they all run directly from the computer where they are installed. They need to be installed on the PC to work, and all essential data, such as game progress and user preferences (like control configurations and audio-visual settings), are stored on the PC.

25.    PC games have existed almost as long as personal computers. The 1980s saw a surge in games created for these new computing devices. As personal computers gained popularity, so did PC games.

26.    In the early days of the PC gaming industry, technological limitations required most gamers to buy their games from brick-and-mortar stores. These games were sold on physical media like CD-ROMs, which users would take home and use to install the games on their computers.

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

27.     Brick-and-mortar retailers face significant costs that digital retailers do not, such as expenses for real estate, shipping, inventory management, and staffing. These costs result in very thin profit margins. Historically, due to these costs, brick-and-mortar stores charged game publishers around 30% in commissions to sell their games. However, this 30% was not pure profit, as a large portion went towards covering their operational costs.

28.     In contrast, digital distributors of PC games operate at a fraction of the cost of physical stores. This significant difference in operating expenses, along with the modern convenience of downloading large PC games at home via high-speed internet, has allowed digital distribution to disrupt traditional retail models. Digital distributors avoid the overhead costs faced by brick-and-mortar stores, enabling them to earn more profit on game sales even with lower commission rates. In a competitive market, free from Valve's restrictions, these advantages would naturally lead to reduced commissions and lower prices for consumers.

29.     Today, most PC games are sold digitally, and Valve's Steam Store is by far the leading distributor.

**B.      Valve Becomes a Dominant Fixture in the PC Gaming Industry**

30.     In 1996, former Microsoft employees created a new video game development company called Valve. The company's first major release came in 1998 with the launch of the PC game *Half-Life*, which was received with critical acclaim. Valve then expanded its portfolio with other well-known game franchises like *Portal* and *Counter-Strike*.

31.     Some of these titles, like *Half-Life* and *Counter-Strike*, supported online multiplayer gaming. Valve relied on a third-party network known as the World Opponent Network ("WON") to support this functionality. In 2001, Valve purchased WON from *Half-Life* developer Sierra and took

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

control of its user base, which numbered 1.5 million players at the time. WON supported *Half-Life*, *Counter-Strike*, and other Sierra-published games while Valve worked on creating its own platform.

32.     Valve introduced Steam in 2003, marking a significant change in the company's business model and strategy. Steam was initially focused only on providing patches (addressing software flaws) and updates (introducing new features and content) for Valve-developed games. Before Steam, patches and upgrades were delivered ad hoc, creating compatibility issues where different users owned different versions of the same game, which prevented multiplayer gaming. Steam offered an organized repository for users to obtain software patches and updates, ensuring their games were kept up to date and compatible.

33.     In 2004, Valve expanded Steam beyond its initial patching and version-control functionality to include a storefront component. With Valve's release of *Half-Life 2* that year, consumers could—for the first time—purchase a digital copy of a game through Steam. While users could also purchase the traditional physical version of *Half-Life 2*, Valve made it mandatory for players to use the Steam platform to play *Half-Life 2*, regardless of where they purchased the game. All *Half-Life 2* players were required to create a Steam account and install the platform on their PC before playing.

34.     These changes initiated what would later be described as Steam's "stranglehold on PC gaming."[2] In order to play the blockbuster hit *Half-Life 2* and other popular Valve titles, consumers had to download and use Steam. Valve effectively compelled consumers to adopt Steam as a prerequisite to play its hugely popular games, rather than relying on the platform's merits to grow.

---

[2] Zachariah Kelly, *Why Valve's Stranglehold on PC Gaming Might Finally Be Coming to an End*, THE AU REVIEW (Dec. 10, 2018), https://www.theaureview.com/games/why-valves-stranglehold-on-pc-gaming-might-finally-be-coming-to-an-end/.

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

35.     At the same time, Valve shut down WON, forcing all players to use Steam for multiplayer features—even those who had purchased *Half-Life* and *Counter-Strike* years before Steam existed. In this way, Valve leveraged the power derived from these games' popularity to create a major multiplayer network, something that had for years eluded smaller publishers like Stardock and non-publishers such as GameStop and Direct2Drive.

36.     Soon, the Steam Store offered not only Valve-created games but also games produced by third-party developers. These developers gave Valve a share of their revenue in exchange for the opportunity to distribute digitally on Steam. By expanding Steam's offerings, Valve extended its commercial reach even further, forcing customers of non-Valve games to also install the Steam platform in order to play. Steam currently hosts at least 50,000 games, the majority of which are created by third-party developers.

37.     Unlike other distributors, Valve refuses to offer games designed for other platforms in the Steam Store. For example, when EA launched its own PC gaming platform, Origin, in 2011, Valve declined to sell Origin-enabled versions of games through its store. EA commented at the time: "At present, there is only one download service [Steam] that will not allow this relationship . . . [The Steam Store] has imposed a set of business terms for developers hoping to sell content on that service – many of which are not imposed by other online game services."[3]

38.     Steam's success has enabled Valve's meteoric rise. In 2005, Valve's gross revenue was an estimated $70 million. Twelve years later, its revenue had ballooned to $4.3 billion. *Forbes* attributed this growth and attendant market power to a lack of competition. In 2011, Valve's CEO, Gabe Newell, described the company as "tremendously profitable."

---

[3] Wesley Yin-Poole, *Why You Can't Buy Crysis 2 from Steam*, EURO-GAMER, https://www.eurogamer.net/articles/2011-07-07-why-you-cant-buy-crysis-2-from-steam (last updated July 7, 2011).

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

39.    In 2015, despite only maintaining 250 employees, Valve earned over $2 billion in profit—more than $5 million per employee. In the years since, Valve's lean workforce has remained remarkably stable, while Valve has simultaneously grown its annual revenue. The company's profits are realized through the anticompetitive means described above and come at the expense of consumers. Valve has itself internally recognized that Steam's profitability is an "outlier" compared to other powerful tech companies like Apple, Alphabet, and Netflix.



40.    Today, Valve is the world's largest distributor of PC games, and holds approximately 75% of the global market, earning billions in revenue per year. Steam has accumulated over 1 billion user accounts. In 2020, the platform reported 120 million monthly active users, 25 million peak concurrent users, and 2.6 million new game purchases per month.

41.    The Epic Games Store is Steam's most significant competitor. But in 2023, it sold only an estimated $310 million worth of third-party games—a small fraction of the billions sold on

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

Steam. Since 2017, Valve has relied almost exclusively on the considerable revenue generated by Steam, developing and releasing only one PC game in seven years. However, Valve has not had to invest any substantial funds in Steam, as its anticompetitive practices have allowed it to enjoy market dominance without focusing on the platform's quality.



42.    Today, Valve employs several strategies to sustain and enhance its market power, as detailed below. These tactics ensure that publishers and consumers alike remain dependent on Steam while simultaneously blocking potential competitors from entering the market.

## V.    VALVE HAS ANTICOMPETITIVELY RESTRAINED TRADE AND MONOPOLIZED THE PC GAME DISTRIBUTION MARKET

43.    To avoid price competition, Valve mandates that publishers sell their games on the Steam Store at their lowest available prices, which constitutes a "most favored nation" ("MFN") clause. In addition to requiring price parity across Steam and rival platforms, Valve also prohibits

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

publishers from offering any additional in-game content or features on rival platforms unless they are also offered on Steam.

44.     Valve's MFN clause is a "Platform MFN" ("PMFN"). PMFNs bar platform sellers from offering "their products or services at a lower price on other platforms."[4] These clauses ensure that other platforms cannot offer a "lower final price, not because the focal platform has worked to ensure that it has the lowest cost, but rather because it has contracted for competitor's prices to be now lower."[5]

45.     Economists have found that PMFNs have a propensity to "harm competition by keeping prices high and discouraging the entry of new platform rivals."[6] In addition, Platform MFNs create a "strong financial incentive" for sellers on a platform "not to offer low[er] prices because any discount must be offered" to buyers on other platforms.[7]

46.     Valve employs such a PMFN on game publishers who list games in the Steam Store. Like other PMFNs, Valve's PMFN prevents publishers from offering their games for lower prices on other platforms and through other distribution channels.

47.     While MFNs arguably can sometimes promote competition by helping to control costs and keep prices down for end consumers, this is not the case with Valve's PMFN. Valve does not purchase games from publishers and, thus, Valve's PMFN does not serve to help it control costs or secure competitive pricing for its inputs relative to competitor platforms.

48.     Rather, Valve's PMFN establishes a price floor across the entire market for PC game distribution, forcing publishers to set prices high enough to accommodate Valve's 30% commission.

---

[4] Jonathan B. Baker & Fiona Scott Morton, *Antitrust Enforcement Against Platform MFNs*, 127 Yale L.J. 2176, 2176 (2018).
[5] *Id.* at 2178.
[6] *Id.* at 2176.
[7] *Id.* at 2179.

CLASS ACTION COMPLAINT                          Cotchett, Pitre & McCarthy, LLP
Case No. 2:24-cv-01743                             999 N. Northlake Way, Suite 215
                                                              Seattle, WA 98103

Publishers are thus forced to use the inflated pricing required by Valve's PMFN to its sales on all other platforms, even if they might want to offer their games at lower prices on other platforms with more favorable revenue-sharing or distribution terms.

49.      As publishers cannot lower pricing to attract customers to alternative platforms and distribution channels where they could retain more revenue from their sales, Valve's PFMN keeps publishers reliant on Steam and blocks them from applying downward pressure on Valve's commission rate.

**A.      Valve Requires that Publishers Accept an Anticompetitive PMFN Clause**

50.      Since at least 2009, Valve has continuously imposed the price parity aspect of its PMFN through contracts and communications with publishers as well as through direct enforcement actions.

51.      One crucial mechanism by which Valve imposes the price parity aspect of its PMFN is through its "Steam Key Rules and Guidelines."[8]

52.      A Steam Key is essentially a product authorization code generated by Valve, allowing access to a game hosted on the Steam platform. These keys are alphanumeric codes that authenticate users and grant a Steam license to verified purchasers.

53.      Publishers utilize Steam Keys in various ways: to sell copies of Steam-compatible games through other stores, to provide promotional access to media and industry insiders, to conduct small-scale beta tests of games in development, and to offer access to developers working on the game.

---

[8] Steamworks Documentation, *Steam Key Rules and Guidelines*, https://partner.steamgames.com/doc/features/keys (last visited Oct. 24, 2024).

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

54.     Publishers must rely on Steam Keys to promote their games, such as by offering free access to media or marketing their game to larger publishers that might invest. Investors, distributors, and publishers in the PC gaming industry require Steam Keys to evaluate a game for potential funding, marketing support, or distribution. Industry media also require publishers to provide Steam Keys to trial games.

55.     Publishers must request Steam Keys from Valve, which has the sole discretion to approve these requests. Once a request is granted, Valve provides a text file filled with 15-character text strings, each representing a unique Steam Key. Publishers can then forward this file to other stores to sell the keys to customers, who can later use these keys to enable their purchased games on Steam.

56.     Valve does not take a commission when publishers sell Steam keys. However, since Steam keys are sold through third-party platforms, allowing publishers to distribute Steam Keys gives Valve the opportunity to recruit consumers to join the Steam platform.

57.     Some of Steam's competitors—including Amazon, GameStop, Walmart, Target, Green Man Gaming, Humble Bundle, and GOG—generally sell Steam Keys on their platforms. Despite these sales involving games compatible with Steam, Steam significantly restricts the number of Steam keys that publishers may request such that Steam Keys constitute a small share of the overall market.

58.     The text of the Steam Key Rules and Guidelines articulates Valve's PMFN: "You should use keys to sell your game on other stores in a similar way to how you sell your game on Steam. It is important that you don't give Steam customers a worse deal than Steam Key purchasers."

59.    In addition, Valve requires publishers to agree to its PMFN when requesting Steam Keys. When submitting the form to request Steam Keys, publishers must indicate agreement with the following three conditions ("Steam Request Conditions"):

- "I understand that I need to sell my game on other stores in a similar way to how I am selling my game on Steam. I agree that I am not giving Steam customers a worse deal."

- "I understand that while it's OK to run a discount on different stores at different times, I agree to give the same offer to Steam customers within a reasonable amount of time."

- "I understand that if I request an extreme number of keys and I'm not offering Steam customers a fair deal, or if my sole business is selling Steam Keys and not offering value to Steam customers, my request may be denied and I may lose the privilege to request keys."

60.    The vast majority of publishers that offer games on Steam have requested and received Steam Keys and have therefore encountered the Steam Key Rules and Guidelines and the Steam Request Conditions.

61.    Steam employees have further confirmed that the obligations in the Steam Request Conditions apply to all game sales, regardless of whether a Steam Key is involved. Valve employees have repeatedly stated as much in communications with publishers:

- A Steam employee emailed a screenshot containing the Steam Request Conditions and stated: "[W]e wouldn't be OK with selling games on Steam if they are available at better prices on other stores, even if they didn't use Steam Keys. If you wanted to sell a non-Steam version of your game for $10 at retail and $20 on Steam, we'd ask to get that same lower price or just stop selling the game on Steam if we couldn't treat our customers fairly."

- In responding to a publisher's question about whether the price parity conditions apply when selling the game without Steam Keys, a Steam employee clarified: "[W]e try not to focus too much on whether the game is being sold via Steam Key or not. It is a specific thing we ask people to respect when they sell keys, but we're also uninterested in operating a store that gives people bad offers- so we just stop selling games if we aren't able to secure the equivalent price for them. . . . (For instance if another service like Uplay or Origin was selling a game for $15 and we were selling it for $20, we'd ask the dev to give us that lower price or opt to not sell the game, even if the sales at the other store weren't using Steam Keys.)."

16

62.    Valve uses punishment and threats to discourage publishers from offering competitive discounts for their games on alternative platforms. Publishers found in violation of the PMFN risk losing access to vital marketing support and even having their games delisted.

63.    Valve employees have confirmed that Steam will delist games if publishers sell them at a better price off-Steam:

- One employee summarized the PFMN price parity policy: "Do-able: Sell the same content and make sure the price on Steam is competitive with where it's being sold anywhere else (using keys or not, in a bundle or not). Not doable: Sell the content to another store at a better price than Steam customers get (using keys or not, in a bundle or not)."

- In communications with a publisher, a Steam employee explained: "If your long term strategy is to sell the games super cheap, that's fine. But constantly offering your products at way better prices on other stores isn't OK, whether you use Steam Keys or not."

- In another email to a publisher, a Steam employee stated, "But to be clear: we wouldn't be OK with selling games on Steam if they are available at better prices on other stores, even if they didn't use Steam Keys. If you wanted to sell a non-Steam version of your game for $10 at retail and $20 on Steam, we'd ask to get that same lower price or just stop selling the game on Steam if we couldn't treat our customers fairly." In response to whether this was a new policy, Valve confirmed," No we've always asked that partners treat our customers fairly, and we've often opted not to promote games or stop selling them altogether if we aren't able to get fair treatment for our users."

64.    Valve also reinforces the price parity portion of its PMFN through its communications to publishers about its foreign currency conversions. A FAQ about an update to Steam's currency conversion policies stated, "Q: Am I required to use Steam's suggested pricing? No. Valve prices our own games based on the suggested pricing matrix, and we think those prices are generally ideal, but you control your pricing on Steam. You can change any price in any currency as needed. Just make sure that you're not disadvantaging Steam customers."[9]

---

[9] Gamesadict, Comment to New Currencies Coming to Steam between Q4 2015 and Q1 2016 (CNY/INR/TWD and others), NeoGAF Gaming Discussion (Nov. 7, 2015),

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

65.     Game publishers and industry participants are aware that Steam's PMFN imposes a

price parity requirement that extends to all off-Steam sales of games:

- In an internal Microsoft email, one employee asked whether Steam requires price parity, and another employee responded, "Yes – they absolutely do . . . Its not formally listed in documentation in Steamworks, but always addressed in-person."

- Another internal Microsoft email acknowledged the PMFN's price parity provision: "[T]he Steam publishing agreement historically has required product and price parity. When I looked at it preAge:DE a few years ago, I found that we could sell at any price we wanted before Steam release, but once we released on Steam we needed to give Steam price parity to our other digital channels. In the case of a GoW5 Steam/Windows Store (Garrison) simship, I'd assume Steam demands you don't undercut them once you release on Steam."

- Tim Sweeney, the founder and CEO of Epic, has stated that "Steam has veto power over prices, so if a multi-store developer wishes to sell their game for a lower price on the Epic Games store than [on] Steam, then: 1) Valve can simply say 'no.'"[10] Sweeney further noted that "If the dominant store has a price parity clause, and takes a much higher revenue share than competitors, then the only way for creators to pass savings on to gamers is by avoiding the dominant store," i.e., Steam.[11]

- A Wolfire Games blog post by David Rosen noted that: "When new video game stores were opening that charged much lower commissions than Valve, I decided that I would provide my game 'Overgrowth' at a lower price to take advantage of the lower commission rates. . . . But when I asked Valve about this plan, they replied that they would remove Overgrowth from Steam if I allowed it to be sold at a lower price anywhere, even from my own website without Steam Keys and without Steam's DRM."[12]

66.     In addition to requiring that publishers offer the same or better price on Steam than

elsewhere, Valve's PFMN also has a content parity element. Publishers must provide the same or

better content on Steam as they do through alternative distribution channels.

---

https://www.neogaf.com/threads/new-currencies-coming-to-steam-between-q4-2015-and-q1-2016-cny-inr-twd-and-others.1123731/.

[10] Tim Sweeney (@TimSweeneyEpic), X (Jan. 30, 2019),
https://x.com/TimSweeneyEpic/status/1090663312814157824.

[11] Tim Sweeney (@TimSweeneyEpic), X (Feb. 2, 2019),
https://x.com/TimSweeneyEpic/status/1091750761392979968.

[12] David Rosen, Blog Post: Regarding the Valve Class Action, WOLFIRE GAMES (May 6, 2021),
http://blog.wolfire.com/2021/05/Regarding-the-Valve-class-action.

CLASS ACTION COMPLAINT                          Cotchett, Pitre & McCarthy, LLP
Case No. 2:24-cv-01743                          999 N. Northlake Way, Suite 215
                                                Seattle, WA 98103

- Section 2.1 of the SDA requires that game updates be delivered to Valve "when available, but in no event later than they are provided to any other third party."

- Section 2.4 of the SDA states that if a publisher distributes a game "through any other (non-Steam) distribution channel, and if [the publisher] distributes any material DLC for the [game] through that other channel, it will deliver the DLC to Valve at the same time such that Steam Account Owners will receive comparable DLC with customers acquiring the [game] through other channels."

- Section 2.4 also stipulates that the publisher may "offer special and unique promotional content" on other platforms as long as "material parity is maintained between Steam Account Owners and users of their distribution channels who make a comparative investment in the [games] and the associated DLC."

67.     Valve has articulated this content parity requirement of its PMFN through correspondence with publishers and developers:

- One member of Steam's Business Team, the team responsible for enforcing Valve's PMFN, instructed developers, "We ask that digital content you offer outside of Steam be made available to Steam users directly so that the Steam version is not disadvantaged."

- A member of Steam's Business Team stated, "In short, what we're asking for is to get DLC [downloadable content] on our store at the same time you launch it elsewhere. It's not OK to launch a DLC on your own or other stores, and then bring it to Steam some weeks or months later."

68.     The content parity requirement of Valve's PFMN removes an important promotional strategy that publishers could otherwise use to draw customers to other stores that provide more favorable distribution terms. Valve's content parity requirement also removes rival platforms' ability to compete by offering users differentiated access to game features.

**B.    Valve Has Continuously Enforced its PMFN**

69.     Valve, through its Steam Business Team working group, actively monitors publisher compliance with the PMFN price and content parity requirements and takes enforcement actions when it detects violations.

70.     Valve has ultimate oversight over publisher pricing changes, which affords it the opportunity to monitor prices and enforce the PMFN price parity provisions. Steam's policy on price

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

changes states that "[i]nitial pricing as well as proposed pricing adjustments will be reviewed by Valve and are usually processed within one or two business days." This insight into pricing affords Steam the opportunity to closely monitor compliance with the PMFN.

71.    Valve has frequently enforced the PMFN price parity policy by refusing to allow publishers to offer games on Steam, and delisting publishers' existing games on Steam, when it learns that a publisher has offered the game at a lower price through another platform. One employee described how these conversations go: "[W]hen games run significant discounts on competing stores, but do not make those discounts available on [S]team," the practice is to ask the publisher "to match the lower price." If the publisher refused, Steam would "often limit marketing of the title on Steam" until its "pricing is competitive among platforms."

> The development partner would usually come back with "█████s eating their margin to run that sale, you are welcome to do the same on Steam". We say "that's not the way we run our business, we work on rev share not wholesale price".
> - Sometimes, the partner will go ahead and run the same discount on Steam.
> - Sometimes, the partner will talk with █████nd have the discount removed or adjusted.
> - Sometimes, we end up in a standoff.
>   - In this situation, we will often limit marketing of the title on Steam until the pricing is competitive among platforms.

72.    Throughout the years, and continuing until at least 2022, Valve employees have repeatedly enforced the PMFN price parity policy in correspondence with publishers:

- In a 2012 internal Valve email chain, one employee candidly discusses the company's approach to price parity enforcement: "If we allow this type of behavior: where we give Steam Keys away and then you sell the ones we gave you for less than you allow us to sell ours . . . it sets a bad precedent. It encourages our customers to shop elsewhere . . . . I think we should try to set in the minds of our customers that if a game is on Steam, Steam is the place to get it."

- In one 2014 email to a game publisher, a Valve employee explained that it would not list the publisher's game and would "wait . . . until the pricing on Steam can be more in line with what customers have access to through other outlets."

20

- In a 2015 internal Steam email, one employee announced that Valve would "remove the purchase offer" for a major game because "[w]e've asked [the publisher] to list a competitive price to what we're seeing at other retail outlets, and they've said they are unable to do so."

- In a 2015 exchange, a Valve employee after noticing that a game was offered at a lower price off-Steam urged a publisher to "update their offering on steam so it is comparable to other offerings, whether by price or content." When the publisher pushed back, Valve responded that it would be "unable to launch [the game] on Steam at the current planned price point."

- In a 2018 email with a publisher, a Valve employee said, "[w]e basically see any selling of the game on PC, Steam Key or not, as part of the same share PC market- so even if you weren't using Steam Keys, we'd just choose to stop selling a game if it was always running discounts of 75% off on one store but 50% off on ours. ([Steam] Keys happen to be tied up in a lot of conversations, but they're pretty irrelevant to the root concern: treat Steam customers fairly)."

- In a 2022 exchange, a publisher asked Valve to run a promotion for the game while it was being sold as part of a bundle to benefit charity. The Valve employee responded to the remark about bundling by reminding the publisher that "the big thing to think about is price—using Steam Keys to sell on other stores is fair play, but it's under the precondition that Steam customers aren't getting screwed over on price." The email further reminded the publisher that "if you want to offer a super low discount elsewhere," Valve expects "Steam players to get that super low discount too."

73.     One member of Valve's Steam Business Team testified in a deposition in related litigation that he could not recall an instance in which Valve identified a price discrepancy and allowed a lower off-Steam price to continue.

74.     Enforcement of PMFN's price parity provision was so routine that Valve employees even created a template email that employees could use to expedite denials of publisher requests for Steam Keys based on suspected violations of the provision. The template relays that "it's important to us that [S]team customers get treated fairly relative to how you're selling the game on other stores." It also states, "We'd be concerned if the game is going to be offered at a much better price somewhere else and want the opportunity to match the offer or provide a similar/equivalent discount."

21

75.    As with its PMFN price parity requirement, Valve likewise enforced the content parity restriction in its PMFN with threats to reduce marketing support and delist games.

76.    When Valve detects violations of the content parity policy of it PMFN, it routinely contacts publishers to threaten punishment if they do not correct the violations. Valve has threatened to delist games and withhold marketing support from publishers until the publisher offers the comparable feature on Steam.

77.    For example, Valve threatened to delist all editions of a game unless the publisher made the remaining edition available on Steam.

78.    Valve told another publisher that it would no longer provide promotional marketing for a game unless the publisher updated Steam with three game costumes that were available on an alternative platform.

79.    In deposition testimony in related litigation, one Valve employee responsible for enforcing the content parity provision of the PMFN testified that if a publisher were found to be promoting content that was not available on Steam, "[w]e might delay some curated promotion. There's a bunch of different things we might do if we realize we're missing content that they have on other channels."

80.    In another instance, a Valve employee threatened to take down a publisher's games when it learned that a starter pack was available on an alternative platform but not Steam. That employee testified at a deposition in related litigation that she sent this email because "[w]e were effectively missing a [downloadable content] offering. So if they weren't going to give us all the versions of the game, then we wanted to stop offering it to customers." The publisher later acquiesced to Valve's threat by removing the starter pack from the alternative platform and withholding it from distribution until it could make the starter pack available on Steam.

81.    As outlined later herein, the "fairness" justification Valve provides is a facade, as customers actually benefit when they can find games available for lower prices on alternative platforms.

**C.    Valve Has Anticompetitively Restrained Trade by Linking Its In-Game Payment Processing to PC Game Distribution**

82.    Publishers offer users the opportunity to purchase enhancements within games they have already purchased. These in-game transactions are commonly known as "microtransactions," and they make up a significant portion of Valve's revenue.

83.    In order for publishers to offer these enhancements and process related micropayments in their games, they must use an In-Game Payment Processing System.

84.    Valve allows publishers to offer the ability to sell in-game enhancements to users only when users pay for the transaction through their Steam Wallet and the publishers process the transaction through Steam's In-Game Payment Processing System, the Steam Microtransactions API.

85.    Valve mandates that publishers use the Steam Microtransactions API through guidelines for publishers in its Steamworks Documentation: "For any in-game purchases, you'll need to use the microtransaction API so Steam customers can only make purchases from the Steam Wallet."[13]

86.    Valve's mandate that publishers use its Microtransactions API for their In-Game Payment Processing System is not technologically required in order to facilitate in-game transactions. In fact, competitor platforms can and do offer users and publishers the opportunity to

---

[13] Steamworks Documentation, *In-Game Purchase Requirements* (last visited Oct. 1, 2024) https://partner.steamgames.com/doc/features/microtransactions.

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

use their In-Game Payment Processing System of choice. For example, Xsolla is an independent provider of PC in-game payment processing services that offers its services across several platforms.

87.     Instead, Valve's requirement that publishers use its Microtransactions API to process in-game payments on Steam serves only to benefit Valve by allowing Valve to extend its 30% commission to In-Game Payment Processing.

88.     Valve's tie between its PC Gaming Distribution platform and its In-Game Payment Processing System is an unlawful tying arrangement that is a standalone violation of Section 1 of the Sherman Act.

## VI.     THE ANTICOMPETITIVE EFFECTS OF VALVE'S CONDUCT

89.     In a competitive marketplace, Valve would be forced to compete with other PC game distribution platforms on pricing, promotional activities, technical support, and more. Instead, Valve's PMFN and its restrictions on in-game payment processing system serve only to block competition, ultimately harming game developers, rival platforms, and consumers.

90.     The anticompetitive effects of Valve's PMFN coupled with its supracompetitive commission ripple through the PC gaming industry. Game developers must list their games on Steam in order to access its vast base of customers, which means that they cannot avoid Steam.

91.     Thus, most developers have no choice but to pay Valve's supracompetitive commission fees. However, the developers still must recover their costs to remain profitable. Accordingly, they must—and do—build Valve's fees into the prices they charge consumers for games and in-game purchases, which results in higher prices to consumers like Plaintiffs.

92.     Valve's PMFN then establishes these inflated game prices as a price floor across the industry because it prevents developers from selling their games on competing platforms at lower prices than those used on Steam.

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

93.     If not for Valve's PMFN, game developers would be free to sell their games through alternative distribution channels at lower prices, including PC game distribution platforms that charged developers lower commission fees. The entry and increased viability of competitor platforms would lead to increased competition among platforms to lower their fees across the market, and developers would be incentivized to lower their prices to battle for sales volume.

94.     By removing these incentives, Valve's conduct has led directly to consumer gamers like Plaintiffs overpaying and—by reducing demand for PC gaming and in-game purchases— decreased output below competitive levels.

95.     Over the years, many established firms, including tech giants and leading game publishers, have attempted to develop alternative platforms that could compete with Steam, yet none have been able to meaningfully challenge Valve's monopoly. Well-established firms with substantial financial resources, like EA, Microsoft, and Amazon, have invested considerable effort and time in attempts to challenge Steam's dominance. Although these competitors attempted to offer platforms with equal or better features and functionality while charging a lower commission rate, none could gain significant market share nor cause downward pressure on Valve's commission rate as economic theories would predict. Rather, their efforts were undermined by Valve's anticompetitive PMFN.

96.     Competitors aiming to challenge Steam in the PC game distribution market must also contend with the significant direct and indirect network effects Steam enjoys by virtue of its vast library of games already purchased by users, social networking functionalities, achievement tracking system, and its established community of "modders"— gamers that alter and customize aspects of a video game for others to play. Competitors would need to convince both gamers and publishers to

CLASS ACTION COMPLAINT                                Cotchett, Pitre & McCarthy, LLP
Case No. 2:24-cv-01743                                999 N. Northlake Way, Suite 215
                                                      Seattle, WA 98103

forgo these benefits in favor of a new platform. Because of Valve's PMFN and the network effects that Steam enjoys, it is difficult for rivals to build a commercially viable alternative to Steam.

97.    By virtue of its PMFN, Valve avoids meaningful price competition from these rival platforms. Valve's PMFN discourages publishers from offering lower prices in any sales channel since any discount must be extended to customers on Steam, where publishers face its 30% commission rate. Additionally, Valve's PMFN acts as an artificial obstacle for market entry. For instance, a new entrant attempting to attract customers to its platform may try to do so by selectively negotiating with suppliers for discounted pricing in return for increased sales volume or other favorable terms. However, Valve's PMFN would require those publishers to charge the same price on the entrant's platform as they do on Steam. This hampers the entrant's ability to present an appealing product to consumers and inhibits new competition that could drive prices down or result in improved product features.

98.    Economic literature recognizes that when a platform imposes a PMFN that restricts lower pricing on other platforms, the PMFN "serves to suppress competition on the crucial dimension of price," which inhibits new entrants from undercutting the dominant platform's commission.[14]

99.    Economic models indicate that a dominant platform's enforcement of a PMFN causes platform fees and retail prices to increase, while also disincentivizing rival platforms from entering the market. For instance, the Boik & Courts model demonstrates that a lower-priced entrant cannot

---

[14] Benjamin Edelman & Julian Wright, *Price Restrictions in Multi-sided Platforms: Practices and Responses*, 10 Competition Pol'y Int'l 86 (2015).

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

gain market entry successfully because the PMFN prevents the entrant from reducing prices to attract both sellers and consumers.[15]

100.    In addition, Valve's PMFN combined with its supracompetitive commission act to suppress output from game developers by reducing demand for PC games and in-game products. Without Valve's PMFN, in a competitive market, consumers would pay lower prices, which would increase demand for PC games, leading to a greater volume of transactions in the relevant markets.

## A.    Valve's Excessive and Anticompetitive Commission Rate is Unconnected to Its Costs or Any Purported Benefits of the Steam Store

101.    The 30% commission that Valve charges on most sales through Steam is higher than it would be in a competitive market and wholly disconnected from the costs it incurs in operating the platform.

102.    Since October 2018, Valve has maintained three tiers for its commission on Steam platform sales: 30% on all of a game's earnings under $10 million; 25% on all of a game's earnings between $10 million and $50 million; and 20% on all of a game's earnings over $50 million.

103.    While the rates that Valve charges are supracompetitive at any of these tiers, the vast majority of sales to consumers through the Steam Store are at the 30% commission rate. According to a Video Game Insights report, 96% of the games on Steam are categorized as indie games that are subject to Valve's 30% commission tier due to lower sales volume. Valve has internally acknowledged that this structure only benefits the "top revenue earners."

104.    In a competitive market, where digital distribution lowers costs, economics suggests that commissions charged by PC game distribution platforms would decrease accordingly. Basic

---

[15] Andre Boik & Kenneth S. Corts, *The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry*, 59 J.L. & Econ. 105, 113–29 (2016).

27

economic theory and market experience suggest that competition from other digital distribution platforms would quickly force Valve's commission rates down.

105.    The 30% commission Valve typically charges today does not reflect current market conditions or the cost structures of digital distribution. Rather, Valve's PMFN allows it to continue charging a commission rate that was originally intended to cover the high costs of physical retail, costs Valve has never needed to pay.

106.    Valve's initial decision to set its commission based on that of physical retailers does not mean Valve's rate was competitive at the time it launched Steam, nor does it justify maintaining that rate forever. Economic analysis indicates that the cost savings from digital distribution should have translated into a temporary profit, which would diminish over time in a competitive environment.

107.    Through Valve's PMFN, it can charge a commission that greatly exceeds its service costs plus a competitive return. In a competitive market, prices are pushed towards a firm's marginal costs. However, Valve avoids such pressure because its PMFN eliminates competition, thereby allowing it to keep its commission rate high. Valve's commission is not sustained because its product is superior but instead because of Valve's dominant market power.

108.    Basic economic theory and market experience suggest that competition from other digital distribution platforms should exert downward pressures on Valve's commission rates. Several competitors have attempted to lower their commissions to compete with Valve and all have failed because Valve's PMFN prevented them from truly competing on price and content, despite the decreasing costs of digital distribution.

109.    For example, when Discord launched its store in 2018, it noted that the 30% commission charged by Valve was unjustified. Discord found that it could maintain its platform,

28

offer leading social networking functionality to consumers, and still give publishers a larger share of the revenue. Thus, Discord chose to charge a 10% commission and even considered lowering this 10% rate in the future.

110.    However, Valve contacted publishers selling games on Discord to enforce its PMFN. Valve acted to ensure that publishers could not benefit from Discord's lower revenue share by reducing retail prices to attract consumers away from Steam. Additionally, Valve launched social media tools on Steam similar to those used on Discord. Thus, even with Discord's competitive commission and social networking tools, it was unable to gain sufficient scale to challenge Valve's dominance. Discord has since shuttered its PC game distribution platform.

111.    Another Valve competitor, Epic Games Store ("EGS"), adopted a 12% commission. According to EGS, this rate was sufficient to cover its costs both for distribution as well as for innovating new features and investing in its platform. EGS has claimed that even with its 12% commission, it still made a healthy profit margin of 5% to 7%.

112.    Thus, as demonstrated by Discord and EGS, platforms can operate profitably with significantly lower commission rates than the typical 30% that Valve charges.

113.    Epic's CEO, Tim Sweeney, has explained that the costs to operate a PC game distribution platform include costs associated with payment processing for major payment methods costs around 2.5-3.5%, content delivery network (CDN) expenses at less than 1.5%, and other variable operating and customer support costs that range from 1% and 2%. Moreover, once a platform reaches sufficient scale, development and support costs in maintaining the platform become negligible. Based on these factors, Sweeney concluded that stores such as Steam that are charging 30% are marking up their costs by 300-400%.

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

114.    Yet, despite its competitive commission rate, EGS was "not yet profitable at its current scale" because it was heavily investing in marketing and user acquisition to capture market share.  In contrast, Steam, being much further developed, should be experiencing greater economies of scale for its digital infrastructure and lower user acquisition costs, resulting in even lower commission rates.

115.    Ubisoft, a publisher that operates its own store, has also criticized Valve's 30% commission as being too high. Chris Early, Ubisoft's Vice President for partnerships and revenue, described Valve's business model as unrealistic and out of touch with current game distribution trends. For a time, Ubisoft stopped releasing some games on Steam, opting instead to release them on its own store as well as on EGS with its 12% commission rate. However, Ubisoft has been unable to completely withdraw from Steam due to Valve's control over the PC gaming ecosystem and access to consumers. As one industry trade source described it, Ubisoft came "crawlin' back" to Valve in September 2024 when it announced that it would begin releasing future titles on Steam going forward.[16]

116.    Digital storefronts outside the PC gaming industry further reflect that Valve's commission rates are higher than they would be in a competitive market. The Google Play Store and Apple's App Store previously charged 30% commissions for distributing mobile apps, a rate that some industry experts believe originated from Steam.[17] However, both stores lowered their commissions to 15% for publishers for the first $1 million in annual revenues. In announcing the commission structure change, Apple noted that it "will benefit the vast majority of developers who

---

[16] Andy Chalk, *Ubisoft Comes Crawlin' Back to Steam*, PC Gamer (Sept. 25, 2024), https://www.pcgamer.com/gaming-industry/ubisoft-comes-crawlin-back-to-steam/.

[17] *E.g.*, Jessica Conditt, *Apple's App Store Antitrust Questions Will Be Uncomfortable for Valve*, Engadget (July 29, 2020), https://www.engadget.com/apple-google-valve-steam-antitrust-hearings-app-store-221442066.html.

CLASS ACTION COMPLAINT                                    Cotchett, Pitre & McCarthy, LLP
Case No. 2:24-cv-01743                                         999 N. Northlake Way, Suite 215
                                                                          Seattle, WA 98103

sell digital goods and services on the store, providing them with a reduced commission on paid apps and in-app purchases."[18] Google stated that this discounted commission generates "funds that can help developers scale up at a critical phase of their growth by hiring more engineers, adding to their marketing staff, increasing server capacity, and more."[19]

117.    One former Apple executive explained that when the company launched its App Store in 2008, "people were willing to bite that 30 percent" because the App Store was a "revolutionary" way for publishers to reach customers.[20] However, the executive later stated that "30 percent is way too much" and that Apple should charge a commission "closer to" the approximate 3% fee that credit card companies charge for transaction processing, recognizing Apple's minimal variable costs for processing app sales.[21] Apple has indeed reduced its commission, and Valve's variable costs are similarly low.

118.    Microsoft also charges a 15% revenue share on all app purchases from its Microsoft Store. App developers on the Microsoft Store that use their own commerce platform or third-party platforms within their apps are charged no fee and thus retain 100% of their revenue. Microsoft charges a 12% commission rate for PC games on the Microsoft Store.

119.    Other online marketplaces that sell third-party products likewise charge significantly lower commission rates than Valve's Steam commissions. For example, Amazon charges between 8% and 17% depending on the product category, eBay charges between 10% and 12%, Etsy charges

---

[18] Press Release, Apple, Apple Announces App Store Small Business Program (Nov. 18, 2020), https://www.apple.com/newsroom/2020/11/apple-announces-app-store-small-business-program/.
[19] Sameer Samat, Boosting Developer Success on Google Play, Android Developers Blog (Mar. 16, 2021), https://android-developers.googleblog.com/2021/03/boosting-dev-success.html.
[20] Jack Nicas, How Apple's 30% App Store Cut Became a Boon and a Headache, NYTIMES, https://www.nytimes.com/2020/08/14/technology/apple-app-store-epic-games-fortnite.html (last updated Nov. 18, 2020).
[21] Id.

CLASS ACTION COMPLAINT                                Cotchett, Pitre & McCarthy, LLP
Case No. 2:24-cv-01743                                999 N. Northlake Way, Suite 215
                                                      Seattle, WA 98103

5% plus a 3% plus a $0.25 payment processing fee when using Etsy Payments, Walmart's third-party marketplace charges between 6% and 15%, and Poshmark has a 20% commission for sales over $15.

120.    Because Valve forecloses competition through its PMFN, it has not been incentivized to invest in improving Steam to the level that would be necessary if it faced pressure from market competitors. Valve has no need to innovate or address publisher and customer concerns, such as harassment, hate speech, and review bombing, in order to maintain its market position, because of its dominant market position.

121.    Given Valve's strategic advantages, it doesn't need to offer a competitive level of quality to consumers, including Plaintiffs, on its Steam Store. Valve reinvests only a small fraction of its revenue into improving and maintaining the Steam Store, allocating very few resources to business development, customer support, and engineering. Competing stores, despite their smaller market share, generally offer superior infrastructure and support.

122.    Additionally, Steam has been marred with basic cybersecurity issues that leave users and publishers vulnerable to hacking, identity theft, fraud, and money-laundering schemes. If Valve faced competitive pressure, it would be forced to address these security concerns to remain competitive.

123.    For example, in 2011, hackers stole "information about Steam transactions between 2004 and 2008," which included "names, email addresses, encrypted billing addresses, and encrypted credit card information," prompting Valve CEO Gabe Newell to advise Steam users to "watch your credit activity and statements." By 2015, approximately 77,000 Steam user accounts were being "hijacked and pillaged each month." In 2016, a "Steam Stealer" malware industry emerged, allowing criminals to defraud Steam users, turning the platform into "the devil's

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

playground." In 2019, Valve agreed to fix a "zero-day" security flaw that had potentially exposed millions of Steam users to hackers, but only after being publicly pressured to do so. Later that same year, Valve stopped the trading and selling of digital items for a game due to concerns that "nearly all [Steam] key purchases that end up being traded or sold on the marketplace are believed to be fraud-sourced" by global fraud networks engaging in money laundering.

124.    PC game consumers have thus been deprived of the benefits of competition, which would lead to reduced game and in-game transaction prices, higher output, and higher quality games and platform services. If Valve did not prevent competition for game prices, gamers would benefit from having access to higher-quality platforms while also enjoying the advantages of competitive pricing in the distribution market. This would improve quality for publishers, platforms, and consumers alike, while simultaneously lowering costs for everyone.

125.    Valve's tiered commission structure further reflects that it charges commissions that are higher than they would be in a competitive market. When Valve lowered its commission rate for only the highest-grossing games, it explained: "It's always been apparent that successful games and their large audiences have a material impact on those network effects, so making sure Steam recognizes and continues to be an attractive platform for those games is an important goal for all participants in the network." Valve's stated "hope [was] this change will reward the positive network effects generated by developers of big games, further aligning their interests with Steam and the community."

126.    Valve understood that it could disincentivize the publishers of high-selling games from exploring more financially attractive options on other platforms by marginally lowering its commission. Valve recognized that losing these large publishers would risk the migration of their extensive fan bases to competitors like EGS that offer more favorable terms to publishers. Thus, by

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

reducing fees for only the highest-grossing games, Valve inadvertently acknowledged that its 30% commission was excessively high. However, even the new 20%-30% commission rates for top-grossing games are still above competitive levels.

127.    Valve's reduction in commission rates is not a volume discount linked to metrics like the number of games sold, bandwidth usage, integration of publisher tools, or hours of gameplay. Instead, the rate reductions were strategic concessions to the biggest game publishers to keep them listing their games on Steam, made only after other platforms seeking to offer more favorable revenue-sharing terms and publishers began attempting to offer their games on self-managed storefronts.

**B.    Valve's Anticompetitive Actions Prevent Other Stores from Offering More Competitive Commission Rates**

128.    Other storefronts have offered—or attempted to offer before being pushed out of business—more publisher-friendly revenue sharing agreements. For instance, as discussed above, Discord offered a 90/10 revenue split. Indie Game Store provided an 80/20 split, with an option for developers to reduce their share to 70% and donate the remaining 10% to a charity of their choice.

129.    The Valve PMFN acts as a barrier to entry and expansion in the PC game distribution and in-game payment processing system markets. While other PC game distributors may seek to charge lower commissions for their platforms, either by negotiating more favorable terms with publishers or by offering innovative and efficient services on their platforms, the PMFN hinders their ability to benefit from these strategies. Since publishers are barred from selling their games at lower prices or offering specialized content on these competing platforms, the PMFN acts as an artificial barrier, stifling competition and limiting the benefits to both publishers and consumers that could arise from other storefronts.

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

130.    Publishers are discouraged from reducing retail prices to attract consumers because they would be likewise required to lower their prices for PC games on Steam. To justify charging a lower price elsewhere, a publisher would need to generate enough sales on the rival platform to compensate for the reduced revenue it would receive from Steam sales. Given Steam's dominant market share and Valve's high revenue share, this outcome is unlikely. Customers will continue to buy from Steam, leading to decreased revenue per sale for publishers. As a result, publishers have little incentive to lower prices, even if they receive a higher revenue share on a different platform.

131.    Due to the PMFN, publishers cannot persuade consumers to switch to rival platforms that offer more favorable revenue shares by offering lower prices on those platforms. This restriction makes the competing storefront's offer less impactful, forcing publishers to remain dependent on access to the Steam platform

132.    By eliminating price competition and charging publishers a commission that is above what it would be in a competitive market, Valve artificially limits the number and quality of PC games. This situation reduces publishers' options for distribution and makes it harder for them to earn returns on their investments. Because Valve's PMFN stifles competition, other PC game stores struggle to acquire market share and thus cannot effectively challenge Valve's dominant position. Time and again, rival platforms have failed to establish a strong commercial strategy due to Valve's dominance and anticompetitive conduct.

133.    As a result, publishers are forced to pay Valve a supracompetitive revenue share because Valve prevents competition from other stores that would otherwise drive down its high revenue rate. This situation also harms consumers, as publishers cannot fully invest in game enhancements, the development of new games, or lower retail prices.

**C.    In a Competitive Market, Valve's Commission Rate Would Decrease**

134.    Due to Valve's PMFN and its negative impact on the market for PC game distribution, publishers lack viable alternatives. They are essentially forced to continue using Steam despite its numerous shortcomings.

135.    In a market free of Valve's PMFN, competition would compel Valve to lower its commission rates to a level that reflects its actual costs plus a reasonable profit, rather than by its anticompetitive behavior.

136.    Absent Valve's PMFN, publishers could freely collaborate with other platforms to offer exclusive promotional pricing or in-game content, which could serve as valuable marketing tools for both the publishers and rival platforms. These promotions would attract customers to these platforms, boosting game sales. Valve would then need to compete with these other stores by offering competitive terms like more favorable pricing or enhanced marketing support to secure exclusive releases or simultaneous releases on Steam.

137.    Competition among platforms for exclusive releases, where a game is released only on a certain platform, would benefit publishers and consumers. For instance, upfront payments for exclusive releases from rival platforms would allow publishers to invest in additional resources for game development, leading to increased quality, innovation, and variety in games available to consumers.

138.    Without Valve's PMFN and other restrictive practices, publishers would be able to partner with other stores to offer games, content, and special in-game features at lower prices than those on Steam on alternative platforms. This would attract customers to those platforms and, in turn, draw market share away from Steam. Moreover, this strategy would afford publishers the

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

opportunity to reach a wider audience, resulting in increased revenue through more sales, even if offered at a lower retail price.

139.    By contrast, Steam's price party and content parity requirements in its PMFN require publishers to deliver their games the same way on Steam as it does on any platform, artificially keeping prices high and limiting these procompetitive benefits. By prohibiting exclusive releases on other storefronts, Valve exerts undue market control and prevents publishers from securing greater sales and better revenue sharing terms than they might otherwise achieve.

## VII.    RELEVANT MARKETS

### A.    Relevant Product Markets

140.    To the extent Plaintiffs must define a relevant market, Plaintiffs do so below.

#### 1.    PC Game Distribution is a Relevant Product Market

141.    A relevant product market is PC Game Distribution in the United States.

142.    PC games are games directly installed onto a user's PC. For the sake of clarity, PC games do not include games based on a web browser (i.e., not directly installed onto a user's PC) even though they may be played on a PC.

143.    PC games are played on PCs and are incompatible with gaming consoles (e.g., Nintendo Switch, Microsoft Xbox) and mobile devices. Thus, PC games are not reasonably interchangeable with other types of games.

144.    Games designed for consoles or mobile devices do not serve as economic substitutes for PC games. Various factors influence consumers' gaming preferences. The differences in user experiences and gaming functionalities between PC, console, and mobile platforms play a significant role in determining which a consumer will purchase. Furthermore, PCs, consoles, and mobile

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

devices each have additional non-gaming uses that influence their cost and perceived value to the user.

145.    PC, console, and mobile gaming are typically viewed as complements rather than substitutes, as they fulfill different roles. PC games can support more advanced graphics and larger memory demands compared to console or mobile games. Mobile devices, in particular, have processing limitations that prevent them from achieving the same level of complexity in animation, audio, and graphics that PC games provide.

146.    In addition to offering superior visual effects, PCs provide consumer gamers with more immersive and customizable control options. PC users can choose from keyboards, mice, joysticks, and even controllers similar to those used on consoles, while console gamers are restricted to the manufacturer's controllers or a limited selection of authorized third-party options. This versatility in control choices is a significant factor driving many consumer gamers to prefer PC gaming over console gaming.

147.    The experience of playing a game on a PC with a keyboard and mouse differs from playing on a console connected to a TV or on a small mobile device. Additionally, many game titles are not consistently available across PC, console, and mobile platforms, reflecting the variations in gameplay experiences and hardware capabilities.

148.    Consumers make deliberate choices about their hardware systems and often stick to their chosen platform due to lock-in effects. For instance, a player who owns an PlayStation and has invested in various PlayStation accessories, such as controllers, cannot easily switch to a Xbox version of a game without buying new hardware. This creates a barrier to transitioning between platforms. In contrast, a key advantage of PCs is that most people already own one, so they don't face additional hardware costs to start gaming on a PC.

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

149.    Even consumers who own multiple hardware systems, like both a PC and a PlayStation, cannot interchange game versions across these platforms. Each system has its own unique functionalities and features, as previously mentioned. For instance, a PlayStation-compatible game cannot be played on a PC, and vice versa.

150.    Consumer gamers often develop extensive game libraries and social networks on their chosen platforms, making it less likely for them to switch systems. For example, a consumer with a large Steam library and numerous friends on Steam is unlikely to purchase the PlayStation version of a game available on both platforms, even if they also own a PlayStation.

151.    Similarly, consumers who play multiplayer games often build extensive social networks on specific platforms, and switching platforms can mean losing the ability to play with their friends. Not all games with online multiplayer options support cross-platform play. For instance, a game available on both PC and PlayStation may not allow PC gamers to play with those on PlayStation. This limitation also applies to different PC gaming platforms.

152.    Additionally, there are significantly more games available for PCs than for consoles.

153.    These differences result in a low cross-elasticity of demand between PC games and console games. Consequently, consumers are unlikely to switch to console games even if the price of PC games rises.

154.    The cross-elasticity of demand between PC games and mobile games is even lower, as most mobile games are available for free and generate revenue through ads or in-game transactions. When mobile games do have a price, it is typically much lower than that of PC games. Unlike PC games, most revenue in mobile gaming comes from in-game transactions rather than the initial purchase price.

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

155.    Consumers generally do not substitute PC games with mobile games intended for shorter, on-the-go play when PC game prices rise. PC gamers are unlikely to switch to mobile games even if the price of PC games rises.

156.    The distinctions between PC games, console games, and mobile games also lead to unique distribution models for each category, influencing their respective markets. While PC games embraced digital distribution early on, console games still rely heavily on physical distribution. In contrast, mobile games are exclusively distributed through app stores designed for mobile devices.

157.    Mobile app stores do not sell PC games, and PC game stores do not carry mobile apps, although different versions of a game title may be available on both platforms. Similarly, consoles have their own exclusive digital storefronts, such as PlayStation or Xbox, which do not offer PC games, and vice versa. Since these games are downloaded directly to the specific device after purchase, they must be accessed using the compatible hardware—whether it's a PC, console, or mobile device. Therefore, a publisher cannot sell a PC game on the PlayStation Store or the Apple App Store to avoid Valve's high revenue-sharing requirements.

158.    Moreover, the size of game files illustrates why games on different platforms—PC, console, and mobile—are complements rather than substitutes, and why their distribution channels cannot be easily interchanged. Factors such as rich graphics, textures, audio, and expansive maps significantly increase a game's data volume.

159.    For all these reasons, consumers cannot simply switch to mobile or console games as a means to counter Valve's high prices on PC games.

160.    Industry experts and analysts recognize that PC games, console games, and mobile games are distinct categories, each with its own metrics. Market research often separates data on these categories to highlight their unique characteristics.

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

161.    Non-desktop PC games—such as browser-based games playable on platforms like Facebook—are also not regarded as interchangeable with PC desktop games. These browser-based games represent the lower end of the gaming spectrum. Before the rise of mobile gaming, they were a popular way to enjoy casual gaming experiences. However, due to the limitations of web browsers, these games faced constraints in quality and performance. As mobile gaming gained traction, developers increasingly shifted their resources from web browser games to mobile platforms. Today, while web browser games still exist, they have become less common and primarily compete with mobile games.

162.    Valve has acknowledged the differences between the PC gaming market and the mobile gaming market in response to a third-party subpoena during an antitrust case involving Epic and Apple in the Northern District of California. In this context, Valve argued that it operates in a different relevant product market from Epic and Apple, asserting that it should not be subject to discovery in the case.

- Valve is a privately held company with approximately 350 employees that develops PC video games. Valve does not make or sell phones, tablets, or video games for mobile devices, or otherwise compete in the mobile market. Valve also operates Steam, an online platform that lets users purchase and play PC games on their laptops and desktops. Steam users cannot buy or use mobile apps on Steam.

- Apple, Google and Samsung compete with each other in the mobile app market. Valve does not compete in that market. The Court already recognized the relevant market must include the product at issue. (Case No. 20-cv-05640-YGR) (Dkt. 118 at 12) (citation omitted). Apple argues the relevant market could be so broad as to include any video game available through any channel, but gives no evidence this might actually be true. Indeed, the Court noted there is "little evidence" iOS users owned multiple devices and changed from one to another in response to price changes.[22]

---

[22] Joint Ltr. Br., *Epic Games, Inc. v. Apple, Inc.*, No. 20-cv-5640, ECF No. 346 at 5-7 (N.D. Cal. Feb 18, 2021).

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

163.    In summary, the PC Game Distribution market is distinct and separate from other gaming markets.

164.    Valve has consistently held monopoly and/or market power, or at least significant monopoly and/or market power, in the PC Game Distribution market.

165.    A small but significant, non-transitory increase above competitive prices for PC games would not cause a significant loss of sales such as to make the increase unprofitable.

166.    Throughout the relevant period, Valve had the ability to maintain prices on Steam at supracompetitive levels without experiencing a significant drop in sales to other platforms selling the same PC games. Valve wielded its market and/or monopoly power to shut out potential competitors from the PC Game Distribution market, thereby causing harm to PC gaming consumers.

**2.    PC In-Game Payment Processing is a Relevant Product Market**

167.    A relevant product market is PC In-Game Payment Processing.

168.    The term "PC In-Game Payment Processing" specifically refers to transactions that take place within games after the initial purchase of a game (e.g., purchase of additional features within the game). PC In-Game Payment Processing is a growing market.

169.    To enable PC in-game transactions, a PC in-game payment processing system is necessary. These systems handle in-game transactions by storing user information, verifying payment details, processing fund disbursements, and tracking payment history.

170.    PC in-game transactions give publishers the chance to offer additional monetized content within their games. Through these transactions, publishers can sell virtual features and goods for real money, including unique abilities, character outfits, access to extra features or levels, and other in-game content.

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

171.    The PC In-Game Payment Processing market is separate and distinct from the PC Games Distribution market. For instance, a Steam publisher must undergo a separate and involved implementation process to access the tools that Steam provides for PC In-Game Payment Processing.

172.    Consumers and publishers have both indicated that they would like to access their PC in-game payment processing services of choice.

173.    The provision of PC In-Game Payment Processing services independent from PC Game Distribution demonstrates that there is separate demand for the two services. For example, the Epic Games Store permits PC game publishers and consumers to use different payment processers for in-game purchases. Epic's CEO Tim Sweeney has acknowledged "developers' right to choose among the best stores, in-app payment processors, online services, and engines . . . [a]nd to mix and match those components as they wish."[23] Similarly, independent providers of PC in-game payment processing have emerged to offer their services across several different platforms (e.g., Xsolla).

174.    In contrast, Valve requires PC game publishers and consumers to conduct in-game transactions exclusively through its in-game payment processing system. Users must use the Steam Wallet for in-game purchases, and Valve's guidelines prohibit publishers from processing transactions through any other payment system.

175.    In a competitive market, Steam would be incentivized to give consumers and publishers the flexibility to use their preferred in-game payment processing systems. This would enable them to avoid Steam's inflated up to 30% fee and seek out services that provide higher-quality transaction services at better prices (i.e., lower fees or higher quality services). Valve's

---

[23] Jeff Grubb, *Epic Games Store Devs Can Now Choose Their Own In-Game Payment Processor*, Venture Beat (Dec. 6, 2019), https://venturebeat.com/pc-gaming/epic-games-store-devs-can-now-choose-their-own-in-game-payment-processor/.

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

restrictions on in-game payment processing systems serve only to allow it to maintain high fees, which are ultimately passed on to consumers.

176.    In summary, the PC In-Game Payment Processing market is distinct and separate from other markets.

177.    Valve has consistently held monopoly and/or market power, or at least significant monopoly and/or market power, in the PC In-Game Payment Processing market.

178.    A small but significant, non-transitory increase above competitive prices for PC in-game payment processing would not cause a significant loss of sales such as to make the increase unprofitable.

179.    Throughout the relevant period, Valve has wielded its monopoly and/or market power to shut out potential competitors from in-game payment processing, thereby causing harm to PC gaming consumers. Valve's restrictions on rival in-game payment processing services permits Valve to charge supracompetitive fees that increase prices to consumers.

**B.    The United States is the Relevant Geographic Market**

180.    The markets for PC Game Distribution and In-Game Payment Processing extend across at least the entire United States. Valve sells PC games through the internet and, thus, Steam is accessible throughout the United States (and globally) to anyone with an internet connection.

181.    Valve advertises Steam as a tool for publishers to "reach a global audience." Further promoting its global reach, Valve states: "Steam is a global platform with full official support for 29 languages across many platform features. Supporting as many languages, currencies, and payment

CLASS ACTION COMPLAINT                          Cotchett, Pitre & McCarthy, LLP
Case No. 2:24-cv-01743                           999 N. Northlake Way, Suite 215
                                                          Seattle, WA 98103

methods as possible enables Steam to provide the best experience possible to customers around the world."[24]

182.    Most other PC game distribution channels besides Steam also operate digitally, without geographic limitations. This further emphasizes that the relevant geographic market is at least as broad as the United States.

## VIII.   VALVE POSSESSES MONOPOLY AND/OR MARKET POWER IN THE RELEVANT MARKETS

### A.    Valve's Steam Store Dominates PC Game Distribution and In-Game Payment Processing

183.    Valve's Steam maintains a dominant position in the markets for the PC Game Distribution and In-Game Payment Processing.

184.    Steam is the top PC game platform in the United States and has a market share of 75% or more. Valve's market share for PC in-game payment processing is likely similar because Valve processes 100% of in-game payment transactions for games on Steam.

185.    Industry participants recognize Steam's dominance over the market for PC game sales:

- One online source states: "Steam dominates the market with an astounding number of active players daily."[25]

- A 2015 handbook about small-developer games observed that "[t]he portal of choice is most definitely Steam. In every indie sales report I've seen, Steam sales eclipse all other portals by a large margin, often selling several times more than on other portal sites."[26]

- A 2019 Epic Games Store board presentation stated that Steam had a 94% market share in 2018.

---

[24] Steamworks Documentation, *Localization and Languages*, https://partner.steamgames.com/doc/store/localization (last visited Oct. 24, 2024).
[25] "96 Steam Statistics You Must Know: 2024 Market Share Analysis & Data," FinancesOnline (Sept. 28, 2024), https://financesonline.com/steam-statistics/.
[26] RICHARD HILL-WHITTALL, THE INDIE GAME DEVELOPER HANDBOOK 77 (2015).

CLASS ACTION COMPLAINT                              Cotchett, Pitre & McCarthy, LLP
Case No. 2:24-cv-01743                              999 N. Northlake Way, Suite 215
                                                    Seattle, WA 98103

- Another 2020 publication found that "[a]s of today, Valve holds the monopoly on indie game sales for the PC market" and compared to "[s]maller stores" such as GOG and Itch.io "in terms of users or sales volume, neither come close to Steam."[27]

- As one publisher recognized in a 2023 email, "[T]here is no doubt that Steam is the biggest PC Games Store." Internally, Valve employees have acknowledged the industrywide sentiment that "Valve is too powerful for their comfort."

186.    Most consumers and publishers cannot avoid using Steam. For example, publishers are unable to avoid using Steam by self-publishing their games because they lack the resources to create and maintain their own digital storefronts. Even if publishers could surpass the financial, practical, and other barriers to entry, the task of building a user base would be nearly insurmountable due to Valve's dominance and its anticompetitive actions that prevent new entrants and innovation.

187.    Due to its dominant market share and extensive user base, consumers and publishers view Steam as a platform with which they must do business. As explained by an EA executive, PC game publishers "want to be where the players are,"[28] which means Steam. Some have expressed concern with this fact, with one stating, "As a developer, it's scary to have one entrenched company dominating all of PC games since we are completely at Valve's mercy."[29]

188.    A long-time Valve employee once remarked, "Valve was really all about controlling the flow of an entertaining experience. Having your hand on that knob, deciding when to turn it up, turn it down." The former employee noted that the company's name, "Valve," aptly serves as a "compelling metaphor."

---

[27] ODILE LIMPACH, THE PUBLISHING CHALLENGE FOR INDEPENDENT VIDEO GAME DEVELOPERS: A PRACTICAL GUIDE 18 (2020).

[28] Chaim Gartenberg, *EA Games Are Returning to Steam Along with the EA Access Subscription Service*, Verge (Oct. 29, 2019), https://www.theverge.com/2019/10/29/20937055/ea-games-steam-access-subscription-service-pc-storefront-jedi-fallen-order-sales.

[29] Nick Statt, *Epic vs. Steam: The Console War Reimagined on the PC*, Verge (Apr. 16, 2019), https://www.theverge.com/2019/4/16/18334865/epic-games-store-versus-steam-valve-pc-gaming-console-war-reimagined.

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

189.    Valve has consistently held monopoly and/or market power, or at least significant monopoly and/or market power, in the PC Game Distribution and PC In-Game Payment Processing markets.

**B.    Significant Barriers to Entry Exist**

190.    The PC Game Distribution and PC In-Game Payment Processing markets feature numerous barriers to entry, reinforcing Valve's monopoly and/or market power.

191.    A Majority Staff Report published by the House of Representatives Subcommittee on Antitrust entitled "Digital Markets Report" identifies typical barriers for technology platforms, which include network effects, switching costs, data accumulation, and economies of scale and scope.[30] Each of these barriers is present in the PC Game Distribution and PC In-Game Payment Processing markets, and with Steam in particular.

192.    Steam benefits from, and its market power is derived from, both direct and indirect network effects. As more consumers engage with the platform, its value increases for both consumer gamers (through direct network effects, enabling them to find others to play with and building a more robust social network) and publishers (via indirect network effects, providing access to a larger audience). Similarly, as more publishers use Steam, its value further increases for gamers. As one former Valve employee observed, "[i]n the Internet age, software has close to zero cost of replication and massive network effects, so there's a positive feedback spiral that means that the first mover dominates."[31]

---

[30] Majority Staff Report and Recommendations, Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary, Investigation of Competition in Digital Markets, at 40 (Oct. 6, 2020), available at https://www.govinfo.gov/content/pkg/CPRT-117HPRT47832/pdf/CPRT-117HPRT47832.pdf?stream=top.

[31] "Valve Has No Formal Management or Hierarchy at All," Halfblog.net (Apr. 14, 2012), https://halfblog.net/2012/04/14/valve-has-no-formal-management-or-hierarchy.

47

CLASS ACTION COMPLAINT                          Cotchett, Pitre & McCarthy, LLP
Case No. 2:24-cv-01743                           999 N. Northlake Way, Suite 215
                                                 Seattle, WA 98103

193.    Steam's platform incorporates social networking features, communities of game modders, and an achievement system that tracks gamers' progress. Users with Steam accounts can create a network of friends and teammates that they can access within any game on Steam, which permits gamers to easily find and invite friends to play games without needing to search for these users each time they purchase or play a new game.

194.    Many large technology companies maintain their market power because it is difficult for consumers to switch away from using their platforms. Although consumers can technically "multi-home" between different PC gaming platforms, the access that Steam offers consumers to their game library, social connections, and achievement tracking system creates strong lock-in effects.

195.    Valve further benefits from the significant volume of data it collects on game usage, preferences and settings, social networking activity, and other activities on its platform, and uses this information to enhance its monopoly and/or market power. Accumulating large amounts of data "can serve as another powerful barrier to entry for firms in the digital economy" and is "self-reinforcing."[32] The American Bar Association's Antitrust Law Section describes how access to large amounts of data can "amplify feedback effects":

> For example, more people using a product can mean that more data, and more diverse data, will be collected, allowing the company to both improve its products as well as potentially identify and offer new ones. This in turn can attract more customers, leading to a positive feedback loop, helping a company to grow and potentially dominate the market. Indeed, data-driven markets may "tip towards one or two products or platforms."[33]

---

[32] Digital Markets Report at 42.

[33] American Bar Association's Antitrust Law Section, *Artificial Intelligence & Machine Learning: Emerging Legal and Self-Regulatory Considerations* (Sept. 30, 2019) https://www.americanbar.org/content/dam/aba/administrative/antitrust_law/comments/october2019/clean-antitrust-ai-report-pt1-093019.pdf at 30 (citing ALLEN GRUNES & MAURICE STUCKE, BIG DATA AND COMPETITION POLICY 163 (2016))

48

196.    Valve also has access to detailed information about its competitors' operations. As the gatekeeper of the Steam platform, Valve sets not only the terms under which game publishers, including its rivals, can access its platforms, but also the terms that govern what those publishers may offer its users. This oversight allows Valve to maintain its dominance by favoring or punishing specific games or publishers, and by altering the rules whenever it feels threatened by particular publishers or competitors in the market.

197.    Valve's gatekeeping ability allows it to favor its own games and maintain leverage over publishers. As owner of Steam, Valve can choose which games to promote, including its own games. Valve can add promotional copies of its games to every Steam user's game library and otherwise ensure that its games are featured prominently on the platform. Conversely, Valve can punish publishers at its discretion by refusing to promote their games, making their games hard to find on its platform, and, in some cases, removing their games from Steam altogether—including games that consumers have already purchased and downloaded.

198.    Valve also has significant oversight over competitors' sales of games and in-game transactions. For example, Valve maintains the right to review and approve any adjustments to the pricing of games listed on its platform in response to competitors' pricing.

199.    Valve has erected barriers further to entry such as its restriction on in-game payment processing for in-game transactions on Steam. Absent Valve's prohibition of rivals from offering such services, there would be other payment processing services available on Steam that could compete with Valve.

200.    Valve's monopoly and/or market power is further illustrated by the anticompetitive effects of its conduct as described earlier in this Complaint. Valve's conduct has resulted in consumers paying supracompetitive prices for PC games and in-game transactions. It has also

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

reduced market-wide output in terms of game and platform quality, innovation, and consumer choice. Because of Valve's restrictive practices, consumers do not benefit from seeking out alternative distributors, which explains why Valve's market share remains above 75%, despite the presence of potential competitors.

**C.    Major Technology Firms Have Struggled to Compete with Valve**

201.    Even the largest and most well-resourced publishers view Steam as an essential platform, illustrating the difficulty of creating a rival PC gaming platform given Valve's dominance and anticompetitive behavior. As discussed herein, major publishers—including Epic Games, EA, Microsoft, Discord, and Humble Publishing—have attempted to challenge Steam's dominance by launching competitor platforms. Each has failed to establish a strong commercial strategy due to Valve's dominance and anticompetitive conduct.

202.    Epic, a leading game publisher known for the massive success of *Fortnite*, launched EGS partly because, as its CEO noted, "[s]tores extract an enormous portion of game industry profits and are ripe for disruption." To attract publishers to its store, Epic offered a much lower 12% revenue share, which it determined was sufficient to cover store costs in a competitive market. It also invested hundreds of millions of dollars to secure exclusivity deals, spending $444 million in 2020 alone, compared to $265 million in third-party game sales that year.

203.    Epic heavily invested in attracting consumers to EGS. It gave away large quantities of free games; in 2020, it gave away 103 titles worth a combined total of $2,407, resulting in 749 million free game claims by customers.

204.    Epic also attempts to compete with Valve by securing timed exclusive access to games on EGS from publishers through various incentives, including minimum revenue guarantees and upfront payments. These arrangements enable publishers to sell games at potentially lower

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

prices due to a more favorable commission, which can boost sales and/or improve game quality, thereby increasing sales.

205.    Despite its aggressive tactics, EGS has not significantly cut into Valve's market share. For instance, although Epic secured an exclusive release for the high-profile game *Borderlands 3*, the game was later released successfully on Steam where it achieved commercial success. Analysis of 2019 figures indicates that despite its efforts, Epic's store likely captured only "a little above 2%" of the market. To acquire this market share, Epic spent $880 million while earning only $680 million in revenue.

206.    In 2020, EGS continued a similar pattern, with PC gamers spending a total of $700 million on the platform, including around $435 million from sales of Epic's proprietary games. Epic also gave away products valued at $2.4 billion while only generating $700 million in revenue through its storefront.

207.    Despite its aggressive strategy to attract users to its platform, EGS failed to gain an appreciable share of the market for PC game distribution. One industry analyst explained, "Two years and four months after its inception on December 4, 2018, the Epic Games Store hasn't done much for its parent company aside from being one of its biggest money losers." EGS incurred approximately $181 million in losses in 2019 and $273 million in losses in 2020. Epic has asserted that its 12% commission covers the operating costs of running EGS. Thus, these losses stem from Epic's heavy promotional spending aimed at challenging Valve's market dominance, rather than from its revenue share rate.

208.    According to Epic Vice President General Manager Steve Allison, the Epic Games Store remained unprofitable as of 2023, nearly five years after its launch. In September 2023, Epic laid off 830 employees, roughly 16% of its workforce.

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

209.    The struggles of EGS reflect that even a well-funded publisher with a vast user base can barely make a dent in Steam's market share. This is due in large part to Valve's anticompetitive conduct. Because of Valve's PMFN, publishers cannot price their games lower on EGS than they do on Steam, restricting Epic's ability to build its user base and market share. The only way publishers can avoid the PMFN is by completely withdrawing from Steam, a strategy that is not economically viable. As a result, publishers must comply with the PMFN, which renders Epic's lower commission structure unable to counteract Valve's supracompetitive 30% rate.

210.    Indeed, even billion-dollar companies with popular PC games have been blocked from successfully competing against Valve in the PC game distribution market. For example, EA is an American video game company and the second-largest gaming company in the Americas and Europe. Despite EA having a market capitalization of $38.5 billion, its attempts to enter the PC game distribution market have failed.

211.    EA launched Origin, its store and game launcher, in 2011 as a "direct-to-consumer gaming platform," allowing gamers to buy, download, and play games directly from EA. While Origin originally carried only EA-developed games, it later expanded to include releases from other major publishers such as Warner Bros., THQ, and Capcom Entertainment, Inc. News articles at the time described Origin as "the biggest threat to Steam's dominance yet."[34]

212.    EA initially mandated that all EA games use the Origin platform, even if purchased through alternative distribution channels. Other distributors like GameStop were willing to sell Origin-enabled version. However, because Steam does not permit publishers to sell versions of games tailored for other platforms, EA had to withdraw its games from the Steam Store. EA

---

[34] Fred Dutton, *Steam vs. Origin: Is Competition Good for Gamers?*, EuroGamer (Dec. 19, 2011), https://www.eurogamer.net/steam-vs-origin-is-competition-good-for-gamers-article.

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

explained, "At present, there is only one download service [Steam] that will not allow this relationship. . . . Steam has imposed a set of business terms for developers hoping to sell content on that service—many of which are not imposed by other game services."

213.    Even though Origin offered access to popular EA franchises such as *SimCity* and *FIFA*, EA eventually returned its games to Steam in 2020 to "be where the players are." As one article put it: "It has been a long and largely fruitless road for Origin, EA's PC gaming client that it had planned on building into a rival of Valve's Steam. What was originally supposed to have been the chief antagonist to Steam in the ongoing PC gaming platform wars instead is best described as a failure to launch." Despite its attempts to compete with Valve via Origin, EA became another publisher subject to Valve's supracompetitive commission on the Steam Store.

214.    Microsoft also attempted to challenge Valve's position in the market.  In 2012, Microsoft launched the Microsoft Store (previously known as Windows Store) as its PC game distribution platform, hoping to attract users by offering access to its popular games and its Windows operating system. Unlike other stores, Microsoft merged all of its distribution channels into a single storefront, including games that operated on both Windows and its Xbox console, an integration that later allowed users to switch between PC and Xbox without purchasing the game separately for each device. The Windows Store, which came pre-installed on Windows PCs, was positioned to become a "near-omnipresent digital storefront," providing Microsoft with a captive audience for its software library and offering a potential challenge to Steam's market dominance.

215.    To grow its share of the PC game distribution market, Microsoft distributed many of its PC games exclusively through the Microsoft Store, including popular titles such as *Age of Empires* and *Microsoft Flight Simulator*.

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

216.    Despite these efforts, Microsoft was unable to establish an appreciable market share in PC game distribution. As a result, in 2019 Microsoft retreated from this strategy and began offering its PC games on Steam again. One insider remarked that Microsoft "has given up entirely" on its bid "to dethrone Steam."

217.    Ubisoft, the publisher behind major franchises such as *Assassin's Creed*, launched Uplay, its gaming client and online store, in 2009. While Ubisoft has the capability to publish and sell games independently of Steam, it continues to list its games on the Steam Store because of Valve's grip on the market.

218.    Even technology giant Amazon was unable to break into the PC game distribution market. Amazon launched the Twitch Store, launching a joint platform/storefront in April 2017, which was recognized as "one of the biggest challenges yet to Steam." The Twitch Store was shuttered just 18 months later.

219.    Google also introduced a competitive offering called Google Stadia, which was intended to be "the future of gaming." However, industry reports indicated that Stadia "absolutely crumbled under expectations," and the platform was ultimately terminated in January 2023.

220.    As described above, Discord also tried and failed to challenge Steam's dominance in the PC gaming market. In August 2018, Discord launched a vertically integrated game distribution platform that harnessed its significant base of users for its digital communications application.

221.    At the time Discord launched its platform, an industry source reportedly called Discord the "biggest threat [Steam has] faced in years." Indeed, Discord initially attracted gamers and publishers by offering exclusive periods during which it would offer certain games for free. Later, Discord enticed developers by announcing that developers of all sizes could self-publish their games.

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

222.    More significantly, Discord offered publishers a more generous revenue share arrangement than Steam at 10%, one-third of Valve's fee. In announcing this arrangement, Discord argued in a blog post that it "[t]urns out, it does not cost 30% to distribute games in 2018." The company asserted that the 10% rate "covers [its] operating costs," and even previewed plans to potentially lower the rate further by "optimizing [its] tech and making things more efficient."

223.    Even though it had a significant user base and policies that were favorable to developers and consumers alike, Discord's gaming platform failed to gain traction. Discord began to "downscale" its efforts by early 2019, shifting towards a service known as Nitro through which gamers could access a pool of games for a monthly fee. Discord announced that it would discontinue the Nitro service in October 2019.

224.    As noted earlier, Discord failed largely due to Valve's anticompetitive behavior. When publishers released their products on Discord to take advantage of its more generous commission structure, Valve contacted those publishers to enforce the parity pricing requirements of its PMFN, hampering developers' ability to avoid Valve's commission as well as Discord's ability to recruit developers to its platform. As publishers were unable to encourage consumers to access their games on more favorable terms on Discord's platform, its publisher-friendly commission was not enough to attract sufficient volume to rival Steam.

225.    Despite Discord's inability to enter the market successfully, Valve perceived the platform as a potential threat. Valve began to replicate Discord's features in Steam. For instance, Valve introduced a social networking feature "Steam Chat." A reporter for Business Insider noted that Steam's chat feature "[took] many cues from Discord, including a suspiciously similar user interface" that looks "almost exactly the same."

226.    The anticompetitive effects described in this Complaint further illustrate Valve's market power. Valve's conduct has resulted in supracompetitive prices in the PC game distribution market, reducing market-wide output in terms of quality, innovation, and consumer choice. Because of Valve's restrictive practices, gamers do not benefit from seeking out alternative distributors. This explains why despite the presence of potential competitors offering services with lower commission rates in the distribution market, Valve is able to maintain its market share of at least 75%.

**D.    Valve's Supracompetitive Commission is Direct Evidence of its Monopoly Power and Market Dominance**

227.    Due to the conduct challenged herein, and as outlined above, Valve has charged supracompetitive fees in PC Game Distribution and PC In-Game Payment Processing markets well in excess of marginal costs and in excess of the competitive price, and has enjoyed the associated high profit margins.

228.    Valve's 30% fee on most PC games and PC in-game payment processing is supracompetitive because it is substantially above Valve's marginal costs.

229.    In markets free from Valve's anticompetitive conduct, Steam's fees would be lower because they would be driven down closer to Steam's marginal costs.

230.    For example, Epic Games has acknowledged in court filings that "Epic decided to charge developers a 12% revenue share after it concluded that 12% would be competitive, sufficient to cover its costs of distribution and allow for further innovation and investment in EGS." Epic's CEO, Tim Sweeney, also stated that "[f]ixed costs of developing and supporting the platform become negligible at a large scale. In our analysis, stores charging 30 per cent are marking up their costs by 300 to 400 per cent."

231.    Discord has also observed that "it does not cost 30% to distribute games" and that a platform could "build amazing developer tools [and] run them" through a 10% fee. Discord went on

to note that "10% covers our operating costs, and we'll explore lowering it by optimizing our tech and making things more efficient."

232.    One trade news source reported in 2018, Steam's "30-percent revenue cut is *steep*, especially given how little Valve does to earn it nowadays."[35]

233.    In addition, Valve's own employees have internally recognized that its 30% commission is significantly greater than the value of the services it provides. Valve employees candidly acknowledged in internal 2018 emails that "[p]retty much everyone agreed that Steam wasn't worth 30%" and that "Steam hasn't had to compete, and thus has gotten lazy and hasn't had to change revenue share." Another 2018 internal email acknowledged "a drumbeat from developers that 30% is too big of a cut for what we provide."

234.    Due to the conduct challenged herein, Valve has been able to charge its 30% fee, which ultimately raises prices for consumers and hampers innovation by restricting the potential earnings of publishers.

235.    Valve's excessive and supracompetitive fees serve as direct evidence of its monopoly and/or market power.

## IX.    ANTITRUST IMPACT

236.    During the relevant time period, Plaintiffs purchased substantial amounts of PC games and engaged in many in-game transactions through the Steam Store. As a result of Valve's illegal conduct, Plaintiffs were compelled to pay, and did pay, artificially inflated prices for its purchases. Those prices were substantially greater than the prices that Plaintiffs would have paid

---

[35] Hayden Dingman, Opinion: *Bethesda.net is Broken: Why Game Makers Who Abandon Steam Need to Get the Basics Right*, PC World (Nov. 30, 2018), https://www.pcworld.com/article/402909/bethesda-net-fallout-76-no-steam.html.

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

absent the illegal conduct alleged herein. As a consequence, Plaintiffs have sustained substantial losses and damage to their business and property in the form of overcharges.

## X.    CLASS ACTION ALLEGATIONS

237.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class:

> All persons and entities who, directly or through an agent, purchased a PC game on the Steam Store, or purchased an in-game product from a game distributed on the Steam Store, in the United States and its territories from January 28, 2017, through the present and until the unlawful conduct alleged herein ceases. Excluded from the Class are Defendant and its employees, parents, and subsidiaries.

Plaintiffs also bring this action on behalf of the following California subclass:

> All persons and entities who, directly or through an agent, purchased a PC game on the Steam Store, or purchased an in-game product from a game distributed on the Steam Store, in California from January 28, 2017, through the present and until the unlawful conduct alleged herein ceases. Excluded from the Class are Defendant and its employees, parents, and subsidiaries.

238.    Consumers are direct purchasers from Valve, the Defendant, and pay overcharges caused by inflated commissions directly to Valve. When a consumer purchases a game on Steam, the consumer purchases the game from Valve and pays Valve the full retail price directly. Likewise, when a consumer makes an in-game purchase using a Steam Wallet, the consumer pays Valve to complete the transaction. In both cases, there is no intermediary in the distribution chain between Valve and the consumer.

239.    The class members are sufficiently numerous to make joinder impracticable. Millions of consumers dispersed throughout the United States have purchased PC games and/or in-game products during the class period.

240.    Plaintiffs' claims are typical of the claims of the members of the class.  Plaintiffs and members of the class sustained damages arising out of Valve's common course of conduct in

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

violation of the laws alleged herein. The damages and injuries of each member of the class, in the form of artificially inflated prices paid to Valve, were directly caused by Valve's wrongful conduct.

241.    Plaintiffs will fairly and adequately protect the interests of the members of the class. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the classes, and Plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the class.

242.    There are questions of law and fact common to the members of the Class, including, but not limited to, the following:

- the existence and scope of a relevant market for PC Game Distribution;

- the existence and scope of a relevant market for PC In-Game Payment Processing;

- Valve's possession of monopoly and/or market power in the relevant markets;

- whether Valve acquired or maintained monopoly and/or market power through anticompetitive conduct;

- whether Valve's anticompetitive conduct has led to increased prices, reduced quality, and/or reduced output in the relevant markets;

- whether Valve has illegally tied its PC In-Game Payment Processing services to its PC Game Distribution services; and

- the existence and quantity of Plaintiffs' and class members' damages.

243.    Questions of law or fact that are common to the members of the class predominate over any questions affecting only individual members of the class.

244.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the class would impose heavy burdens on the courts and Valve and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Classes. A class action, on

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

the other hand, would achieve substantial economies of time, effort, and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the vast majority of class members to seek redress for the violations of law alleged herein.

## XI.    FRAUDULENT CONCEALMENT

245.    Valve has taken affirmative steps to mislead Plaintiffs and the public about the existence of its PMFN.

246.    In its Answers in related litigation, *Wolfire Games, LLC v. Valve Corporation*, No. 21-cv-0563 (W.D. Wash.), Valve denied the existence of its PMFN.

247.    In its motion to dismiss the *Wolfire Games* complaint, Valve represented that its PMFN was a nonexistent "shadow policy." Valve further characterized claims arising from the PMFN as "thoroughly fanciful."

248.    Most recently, in opposing class certification, Valve again denied the existence of its PMFN. It stated that its alleged "content parity component does not exist" and that the "price parity component of the alleged PMFN" is a "fantasy."

249.    As described above, Valve's representations in continuously denying the existence of its PMFN, one of the core elements of its anticompetitive conduct, are false. Moreover, consumers are not privy to the PMFN because it is communicated only to publishers through a combination of written rules, unwritten norms, and private communications. Accordingly, Valve denied Plaintiffs the opportunity to investigate and initiate their claims at the time the conduct commenced.

250.    The affirmative steps that Valve has taken to fraudulently conceal its PMFN have tolled the statute of limitations as to the claims asserted in this Complaint.

## XII.    CAUSES OF ACTION

**FIRST CAUSE OF ACTION: SHERMAN ACT SECTION 2—MONOPOLIZATION OF THE PC GAME DISTRIBUTION MARKET**

251.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

252.    The PC Game Distribution market is a valid antitrust market.

253.    Valve possesses monopoly power in the PC Game Distribution market.

254.    Through the exclusionary and anticompetitive conduct alleged herein, Valve has willfully maintained and/or enhanced its monopoly power in the relevant market for PC Game Distribution.

255.    There are no procompetitive benefits or justifications that offset the competitive harm of Valve's unlawful conduct

256.    Valve's conduct has had a substantial effect on interstate commerce.

257.    As a result of Valve's unlawful conduct as alleged herein, Plaintiffs and members of the class have suffered, and continue to suffer, monetary harm in the form of overcharge injuries in an amount to be proved at trial.

**SECOND CAUSE OF ACTION: SHERMAN ACT SECTION 2—ATTEMPTED MONOPOLIZATION OF THE PC GAME DISTRIBUTION MARKET**

258.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

259.    Valve has attempted to monopolize the PC Game Distribution market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

260.    Valve has the specific intent to monopolize the PC Game Distribution market by engaging in exclusionary and anticompetitive conduct, has engaged in such conduct, and has a dangerous probability of success in achieving monopoly power.

261.    As a direct and proximate result of the foregoing conduct, Plaintiffs and the class have suffered, and continue to suffer, monetary harm in the form of overcharge injuries in an amount to be proved at trial.

### THIRD CAUSE OF ACTION: SHERMAN ACT SECTION 2—MONOPOLIZATION OF THE PC IN-GAME PAYMENT PROCESSING MARKET

262.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

263.    The PC In-Game Payment Processing market is a valid antitrust market.

264.    Valve possesses monopoly power in the PC In-Game Payment Processing market.

265.    Through the exclusionary and anticompetitive conduct alleged herein, Valve has willfully maintained and/or enhanced its monopoly power in the relevant market for PC In-Game Payment Processing.

266.    There are no procompetitive benefits or justifications that offset the competitive harm of Valve's unlawful conduct.

267.    Valve's conduct has had a substantial effect on interstate commerce.

268.    As a result of Valve's unlawful conduct as alleged herein, Plaintiffs and members of the class have suffered, and continue to suffer, monetary harm in the form of overcharge injuries in an amount to be proved at trial.

### FOURTH CAUSE OF ACTION: SHERMAN ACT SECTION 2—ATTEMPTED MONOPOLIZATION OF THE PC IN-GAME PAYMENT PROCESSING MARKET

269.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

62

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

270.     Valve has attempted to monopolize the PC In-Game Payment Processing market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

271.     Valve has the specific intent to monopolize the PC In-Game Payment Processing market by engaging in exclusionary and anticompetitive conduct, has engaged in such conduct, and has a dangerous probability of success in achieving monopoly power.

272.     As a direct and proximate result of the foregoing conduct, Plaintiffs and the class have suffered, and continue to suffer, monetary harm in the form of overcharge injuries in an amount to be proved at trial.

**FIFTH CAUSE OF ACTION: SHERMAN ACT SECTION 1— UNREASONABLE RESTRAINTS OF TRADE THROUGH TYING**

273.     The foregoing paragraphs are incorporated by reference as though fully set forth herein.

274.     Valve unlawfully tied PC In-Game Payment Processing to PC Game Distribution through its agreements with game publishers by requiring consumers to use a Steam Wallet to make purchases of in-game content on Steam. This tie prevents customers from using alternative in-game purchase processing options.

275.     PC Game Distribution and PC In-Game Payment Processing are separate and distinct products in separate product markets. Consumers can and do purchase PC Game Distribution service without also obtaining PC In-Game Payment Processing from the same provider. In addition, these products are frequently sold by separate providers in adjacent gaming markets.

276.     Valve has monopoly in its products in the PC Game Distribution and PC In-Game Payment Processing markets, or in the alternative, sufficient market power in each market to coerce publishers to license each product, thus restraining competition in both markets.

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

277.    Valve's tying arrangements affect a substantial volume of commerce in the PC Game Distribution and PC In-Game Payment Processing markets.

278.    Valve's tying arrangements have excluded competition in the PC Game Distribution and PC In-Game Payment Processing markets and foreclosed competitors in each market and impaired competition in each market for reasons having nothing to do with the merits of any Valve product.

279.    For the reasons set forth above, Valve has violated Section 2 of the Sherman Act, 15 U.S.C. § 1.

**SIXTH CAUSE OF ACTION: SHERMAN ACT SECTION 1—UNREASONABLE RESTRAINTS OF TRADE**

280.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

281.    Valve has unreasonably restrained trade, controlled prices, excluded competition, and willfully acquired and maintained market power in the markets for PC Game Distribution and PC In-Game Payment Processing through its contracts with game publishers.

282.    In order to distribute games and in-game content through the Steam, Valve requires that game publishers agree to a PMFN under which they are disallowed from offering better prices or unique in-game content for any games when offered on platforms other than Steam.

283.    Valve's agreements in restraint of trade have caused anticompetitive effects in the PC Game Distribution and PC In-Game Payment Processing relevant markets.

284.    There are no procompetitive benefits or justifications that offset the competitive harm of Valve's unlawful conduct. In addition, there were less restrictive means than the unlawful conduct that Valve engaged in.

285.    Valve's conduct has had a substantial effect on interstate commerce.

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

286.    As a direct and proximate result of the foregoing conduct, Plaintiffs and the class have suffered, and continue to suffer, monetary harm in the form of overcharge injuries in an amount to be proved at trial.

**SEVENTH CAUSE OF ACTION— CALIFORNIA UNFAIR COMPETITION LAW**
**(California Subclass)**

287.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

288.    Valve's conduct constitutes deceptive, fraudulent, unlawful and/or unfair business acts and practices, including Valve's violations of Section 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and the California Cartwright Act (Cal. Bus. & Prof. §§16700 et al.)

289.    Valve's conduct threatens an incipient violation of the antitrust laws alleged herein, and it violates the policy and spirit of those laws because the effects of the conduct are comparable to or the same as a violation of the law, and it otherwise significantly threatens and harms competition.

290.    Additionally, Valve's conduct on balance harms consumers and competition, offends established public policy, is substantially injurious to consumers, and is neither outweighed by countervailing benefits nor avoidable by consumers.

291.    California has an overriding interest in ensuring that its residents are permitted to assert claims for public injunctive relief under the UCL.

292.    Plaintiffs were injured by these violations, including through their overpayment for PC games and in-game products. In addition, Plaintiffs seek public injunctive relief under the UCL, including a permanent injunction to prevent Valve from maintaining its PFMN, its tying arrangements, and other anticompetitive tactics Valve uses to maintain monopolies in the PC Game Distribution Market and the PC In-Game Payment Processing Market. An injunction would benefit

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

future purchasers of PC Games and in-game content as well as the broader public by bringing competition into these markets.

### EIGHTH CAUSE OF ACTION—WASHINGTON CONSUMER PROTECTION ACT
### (Nationwide Class)

293.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

294.    The claims alleged above constitute antitrust violations pursuant to the Washington Consumer Protection Act, RCW 19.86.020, 19.86.040, and 19.86.030, *et seq.*

295.    Valve has engaged in unfair and/or deceptive business practices that affect the public interest and have caused injury to business and property.

296.    Valve's contracts and agreements with publishers are in restraint of trade and have the purpose and effect of fixing prices in the relevant market above a competitive level.

297.    Valve's monopolization and attempted monopolization conduct are in restraint of trade and have the purpose and effect of fixing prices in the relevant market above the competitive level.

### XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for a judgment in their favor and against Defendant and for the following relief:

1)    That the Court certify the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, certify Plaintiff as a Class representative and designate its counsel as counsel for the Class;

2)    That the Court declare that Valve's conduct constitutes a violation of the laws alleged herein;

CLASS ACTION COMPLAINT
Case No. 2:24-cv-01743

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

3) That the Court award Plaintiff and the proposed classes all appropriate relief, to include, but not be limited to, monetary relief, whether by way of restitution or damages, including treble damages, or other multiple or punitive damages, or restitution, where mandated by law or equity or as otherwise available, together with pre- and post-judgment interest to the maximum levels permitted by law or equity; injunctive relief requiring that Steam cease the exclusionary and anticompetitive practices described herein; and declaratory relief, adjudging such practices unlawful;

4) That the Court Award Plaintiff and the proposed Class their costs of the suit, including attorneys' fees, as provided by law;

5) That the Court grant such additional orders or judgments as may be necessary to prevent the unlawful practices; and

6) That the Court grant other relief as the Court may deem just and proper.

## XIV.  JURY DEMAND

Plaintiffs demand a trial by jury of all the claims asserted in this Complaint so triable.

DATED: October 24, 2024

Respectfully submitted,

/s/*Karin B. Swope*

Karin B. Swope, WSBA No. 24015
Thomas E. Loeser, WSBA No. 38701
COTCHETT, PITRE & MCCARTHY, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103
Phone: (206) 802-1272
Fax: (650) 697-0577
tloeser@cpmlegal.com
kswope@cpmlegal.com

Derek W. Loeser (WSBA No. 24274)

67

David Ko (WSBA No. 38299)
Ryan McDevitt (WSBA No. 43305)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
Telephone:  (206) 623-1900
dloeser@kellerrohrback.com
dko@kellerrohrback.com
rmcdevitt@kellerrohrback.com

Michael C. Dell'Angelo*
Candice J. Enders*
Zachary D. Caplan*
Julia McGrath*
Najah A. Jacobs*
Jeremy Gradwohl*
Sarah Zimmerman*
BERGER MONTAGUE PC
1818 Market Street
Philadelphia, PA 19103
Telephone:  (215) 875-3000
mdellangelo@bm.net
cenders@bm.net
zcaplan@bm.net
jmcgrath@bm.net
njacobs@bm.net
jgradwohl@bm.net
szimmerman@bm.net

*motion for admission *pro hac vice* forthcoming

68